[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17646
_____

D.C. Docket No. 8:16-cr-00239-SCB-JSS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DELEXSIA HARRIS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 2, 2018)

Before JILL PRYOR and HULL, Circuit Judges, and PROCTOR,[*] District Judge.

JILL PRYOR, Circuit Judge:

_____

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

Several of Delexsia Harris's brothers were charged in federal court with a drug and racketeering conspiracy involving multiple murders.  In an effort to secure her brothers' acquittal, Harris lied to law enforcement, encouraged a witness to provide false alibi testimony, and threatened individuals who might testify against her brothers.  Harris was convicted of witness tampering and obstruction of justice.  She now appeals her convictions, challenging several of the district court's evidentiary rulings.  After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

Harris lived in a house on 24th Street in Bradenton, Florida, with her father, Napoleon Harris Sr., and her brothers, Charlie Green, Napoleon Harris Jr., and Nathaniel Harris.  Another brother, Corey Harris, lived nearby.  Harris's brothers often sold drugs and used the 24th Street house as a base for conducting some of their drug distribution activities.  The following evidence was presented at trial.

## A.    Ceola Lazier's Murder

Green's girlfriend, Lashawn White, testified at Harris's trial that she overheard someone tell Green that another drug dealer named Ceola Lazier "want[ed] [Green] dead because he was . . . taking all of the drug money" from the drug business in the area.  Doc. 97 at 40.[1]  The next day, Green called Harris and

_____

[1] All citations in the form "Doc. #" refer to the district court docket entries.

asked her to meet him at White's house.  When Harris arrived at White's house, Green told Harris that "he needed her to get [Lazier's] number because [Lazier] want[ed] . . . [Green] dead and they need[ed] to handle that." *Id.* at 42.  Harris and Green then left White's house together.

Later that day, Green visited several of his associates, including Christopher Barton and Willie Miller, at a house where they all sold drugs.  Barton testified at trial that Green told the others he was looking for Nathaniel Harris's AR-15 rifle.  Miller said that he had the rifle at his house, so Barton and Green went to Miller's house and retrieved it.  They then headed to Green's house, where Green retrieved a second rifle—an AK-47.

Green and Barton drove to White's house and exchanged Green's car for White's Ford Taurus.  Then they drove to the Harrises' house on 24th Street.  Later that same day, Jimmy Boyd, another of Green's associates, joined Green and Barton at the 24th Street house.  The group discussed their plan to have Harris bring Lazier to the 24th Street house and then to kill him there.  Barton questioned why Lazier would come to the 24th Street house amid his dispute with Green, who lived there, but Green told Barton not to worry because Harris "was going to bring him over there." *Id.* at 80-81.  The group eventually went across the street to Boyd's house where they waited to execute the plan.

3

Barton fell asleep later that night as they waited at Boyd's house. Green woke Barton up in the early morning hours and told him that they had "almost missed a text," meaning a text message from Harris, and that the plan was going into motion. *Id.* at 81. As the others in the group checked their guns and put black t-shirts over their faces as masks, Barton—tasked with serving as the getaway driver—went outside and started the car. A few seconds later, Barton heard "30 or 40" gun shots. Doc. 96 at 217. Green and one of the other men then ran to the car and jumped in, and Barton drove them away.

Harris, who had spent the evening with Lazier, called 911 and reported that she and Lazier had been followed by a white truck and that people in the truck had started shooting at them when she got out of Lazier's car in front of the 24th Street house. Harris told the 911 operator that she thought Lazier was dead inside the car. She also reported that the white truck, which she identified as a Mercedes Benz, had sped off.

The police officer dispatched to the scene found Lazier's car, which had been shot on both sides and through the windshield. Lazier's body was inside the car in the driver's seat. Bullet casings were strewn across the road.

## B.    The Investigation of Lazier's Murder

Bradenton Police Department Detective James Curulla met with Harris at the police station hours after the murder. The video of Curulla's interview with

4

Harris was played for the jury during Harris's trial. In the interview, Harris reported the incident to Curulla as follows. Harris was with her boyfriend, Lazier, outside of his grandmother's house in Palmetto, Florida, when a white Mercedes Benz truck began driving around them. Harris became frightened and asked Lazier to take her home. The truck followed them as they stopped at a gas station along the way. After they left the gas station, they drove to the 24th Street house. As soon as they arrived there, the truck drove at them from the opposite direction on 24th Street. When Harris got out of the car, two men jumped out of the truck and started shooting. Harris ran from the scene and was unable to see the shooters' faces. She noticed, however, that the shooters were wearing all black and carrying large rifles. Harris told Curulla that a few days earlier Lazier had been in a fight with somebody from Palmetto over drug money.

White testified that Harris left the police station and went to White's house, where she told White what had happened. Harris told White that she had contacted Lazier at Green's request and that she and Lazier had gone out for dinner together. After dinner, Lazier had driven her back to the 24th Street house, and—while still in Lazier's car—Harris had pretended to take a phone call from a friend. After she hung up, Green and another man had come from behind a house and started shooting at Lazier's car. As Harris was explaining to White what had happened, Green arrived at White's house and asked Harris what she had told the police.

Harris replied that she had not told the police anything.  White went outside to see if Green had returned her car and found a stretched out black t-shirt in the backseat.

While Harris was at White's house, Curulla investigated the scene of Lazier's murder.  By examining the shell casings he found, Curulla determined that the shots had come from two different guns, an AR-15 and an AK-47.  Based on the location of the shell casings, Curulla determined—contrary to what Harris had told him—that the vehicle containing the shooters could not have driven toward Lazier's vehicle from the opposite direction on 24th Street.  A vehicle driving from the opposite direction would have driven over the shell casings—which remained intact on the road—as it left the scene.

Curulla acquired several surveillance videos that also contradicted Harris's account.  First, a surveillance video from a nearby business showed that Lazier and Harris had not taken the route that Harris had described to Curulla.  This video also showed that no white vehicle had been following them.  Second, footage from a camera at a traffic light along the route where Harris said she and Lazier had traveled failed to show that they were followed by a white vehicle.  A third video, taken from the gas station where Lazier and Harris had stopped, showed that no white Mercedes Benz truck had been at the gas station at the same time as Lazier and Harris.  The gas station video did reveal, however, that a different white

6

truck—likely a Cadillac or Chevrolet—had been at the gas station that night.

A few days after Lazier's murder, Curulla took Harris on a "ride-along," meaning they traveled together along the route that Harris claimed to have driven with Lazier on the night of the murder, beginning at Lazier's grandmother's house. Harris was "adamant" that the truck that had followed them was a Mercedes Benz, noting that she had been able to "see the Mercedes emblem" as she looked in the side-view mirror of Lazier's car. Doc. 98 at 121-23. But when Curulla confronted Harris with the fact that the gas station video showed a white Cadillac or Chevrolet rather than a Mercedes Benz, Harris agreed that the vehicle had been one of those makes.

Curulla began focusing his investigation of Lazier's murder on Harris's brothers and their associates. He attempted to contact Harris in the month that followed Lazier's murder but was unable to do so. Finally, Curulla found Harris at Boyd's house. As soon as Curulla started asking Harris questions about Lazier's murder, Harris's "attitude completely changed." *Id.* at 135. She refused to talk to Curulla any further and walked back into Boyd's house. Because of the contrast between this interaction and Harris's conduct in the immediate aftermath of Lazier's murder, Curulla suspected that Harris had been lying to him.

**C.    Harris's Brothers' Indictment for a Drug and Racketeering Conspiracy**

In May 2012, two months before Lazier's murder, a grand jury returned an indictment charging Angel Villanueva and unnamed coconspirators with drug and gun crimes (the "Villanueva Case"). Nathaniel Harris was Villanueva's primary partner in the charged drug trafficking operation, which also employed Harris's other brothers: Green, Napoleon Harris Jr., and Corey Harris. Over the course of several years, the grand jury returned two superseding indictments. The first superseding indictment added Nathaniel as a codefendant on the drug and gun charges. The second superseding indictment added several more codefendants, including Green, Napoleon, and Corey, and charged various combinations of the defendants with committing seven murders and engaging in a drug and racketeering conspiracy, which also involved numerous other crimes. The second superseding indictment charged Green with Lazier's murder. It also charged Green and Napoleon, along with several others, of having conspired to murder a man named Brenton Coleman.

**D.    Evidence of Harris's Witness Tampering and Obstruction of Justice**

In August 2013, Harris threatened a witness to Coleman's murder, Lawanda Evans. During a television interview about Coleman's murder, Evans had encouraged anyone with information about the murder to come forward. After Evans's interview aired, Harris went to Evans's house and told her that she "had a

8

message" from her brother Napoleon: Evans was to remain loyal to the Harris family or her children would "come up missing." Doc. 97 at 165. Evans interpreted this message to mean that her children might be kidnapped or killed.

As the date of Harris's brothers' trial in the Villanueva Case neared, the district court in that case entered a protective order forbidding the release of the names of the government's civilian witnesses until fourteen days before the government intended to call those witnesses at trial. The protective order also prohibited the defendants' counsel from revealing to the defendants the names of any civilian witnesses until seven days before those witnesses would be called to testify. The government admitted this protective order as an exhibit during Harris's trial. The jury also heard evidence that the protective order was violated at one point during the trial in the Villanueva Case when White's name was leaked to the public, and the government was forced to react to this leak by immediately relocating White to a safe location.

Before the trial in the Villanueva Case, Harris called White several times in an effort to convince her to serve as an alibi witness for Green. When Harris called White, she would ask whether White had told Green's lawyer that White was with Green during some of the alleged crimes, including Lazier's murder. According to White, Harris pressed her to serve as an alibi witness even though Harris knew that White had not actually been with Green during Lazier's murder.

9

Two weeks before the trial in the Villanueva Case was set to begin, Harris began making threatening posts on Facebook about people named in "the paperwork from [her brothers'] lawyers," presumably referring to people who were identified to testify as witnesses. Doc. 98 at 31. Lazier's sister saw these posts on Harris's Facebook page and became concerned for the safety of the government's witnesses. She interpreted the posts as attempts to intimidate the government's witnesses to keep them from testifying in court. In one post, for example, Harris named Cierra Martin—who eventually did testify against Harris's brothers at trial—telling Martin to "[w]atch out little snitch" and warning her not to "get up on the stand." Doc. 98 at 49. Harris also posted depictions of guns and bombs pointing at police cars. The detective who investigated Harris's Facebook account explained that in Bradenton cooperators often were called "police." Thus, the police cars represented not just actual police officers, but also "anybody working with the police," which would have included the government's witnesses. *Id.* at 48.

### E.    Procedural History

Harris was charged by information with one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(1) and (j), and one count of obstruction of justice, in violation of 18 U.S.C. §§ 1503 and 2. A jury found her guilty on both counts.

10

Harris now appeals her convictions, but only by challenging certain evidentiary rulings.

## II.    STANDARDS OF REVIEW

We generally review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009).  But "when a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only."  *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1340 (11th Cir. 2009) (internal quotation marks omitted).

## III.    DISCUSSION

Harris challenges four of the district court's evidentiary rulings.  First, she argues that the district court erred by denying her motion in limine to exclude all evidence relating to Lazier's murder.  Second, she challenges the admission of White's testimony about having overheard someone tell Green that Lazier wanted him dead and also about having heard Green repeat that statement to Harris.  Third, she challenges the admission of Barton's testimony about Green's statements on the night of Lazier's murder.  Fourth, Harris argues that the district court erred by admitting evidence of the protective order entered in the Villanueva Case.  In addition to her specific evidentiary challenges, Harris also argues that the cumulative effect of the district court's evidentiary errors prejudiced her right to a fair trial.  We address Harris's arguments in turn.

11

## A.    The District Court Did Not Abuse Its Discretion by Admitting Evidence Concerning Lazier's Murder.

Before her trial, Harris filed a motion in limine arguing that the district court should exclude all evidence concerning Lazier's murder as irrelevant and unduly prejudicial under Federal Rule of Evidence 403, which provides that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Harris now argues that the district court abused its discretion by denying her motion and then permitting the government to admit the evidence at trial.[2] In addition to her general challenge to

---

[2] The government argues that we should review the district court's ruling for plain error rather than abuse of discretion because (1) Harris raises her Rule 403 objection for the first time on appeal, (2) Harris failed to object to the admission of this evidence on any ground at trial, and (3) Harris failed to renew her motion in limine after the government filed the superseding information. We reject each of these arguments.

First, contrary to the government's assertion, Harris expressly relied on Rule 403 in her motion in limine. *See* Doc. 43 at 1 ("Evidence concerning the murder of Ceola Lazier should be excluded from this case pursuant to Federal Rule of Evidence 401 *and 403*." (emphasis added)). Thus, she asserts no new objection on appeal. Second, because the district court ruled definitively on the record, Harris's objection was preserved for appeal even if we assume that she did not object at trial. Fed. R. Evid. 103(b); *see United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015) (quoting Rule 103(b), which states that "[o]nce the court rules *definitively* on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal" (emphasis added)); *see also Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1178 (11th Cir. 2013) ("[W]e review claims of error raised and decided in an *in limine* motion as long as the district court's ruling was definitive."). During the hearing on Harris's motion in limine, the district court repeatedly expressed concern about excluding all evidence of Lazier's murder because that murder formed the basis of the obstruction charge. And at the end of hearing, the district court ruled "definitively" by denying Harris's motion in full. Fed. R. Evid. 103(b). Harris's objection was thus preserved for appeal even if she failed to object at trial. Third, the government fails to cite—and we are unaware of— any authority supporting its argument that Harris failed to preserve the objection raised in her motion in limine by failing to renew that motion after the government filed the superseding information. And in any event, the changes in the superseding information were not substantial

12

the admission of *all* evidence concerning Lazier's murder, Harris challenges in particular the government's admission of five crime scene photographs. We will address Harris's general challenge before turning to the five crime scene photographs.

Harris grounds her argument in the fact that she was charged only with witness tampering and obstruction of justice. She argues that the admission of evidence concerning Lazier's murder was akin to putting her on trial for the murder, for which she was never indicted. But without the evidence of Lazier's murder and, in particular, Harris's knowledge of the true circumstances surrounding that murder, the jury would have lacked the context necessary to assess whether she had obstructed justice.[3]

The government charged Harris with obstructing justice in the Villanueva Case—which involved multiple murders. The superseding information also focused in particular on obstruction relating to the investigation of Lazier's murder. The superseding information charged that Harris had obstructed justice by "[m]aking false statements to law enforcement following the murder of Ceola

---

enough to warrant a renewed motion. For all of these reasons, we review the district court's ruling for an abuse of discretion.

[3] The obstruction statute Harris was charged with violating makes it illegal for an individual to "corruptly or by threats or force, or by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).

Lazier" and "[a]ssisting Charlie Green in attempts to obtain false alibi testimony [regarding the murder] from [White]." Doc. 55 at 2. The superseding information also charged that Harris had carried out these acts "corruptly." *Id.* Evidence concerning Lazier's murder was highly probative of these charges.

For example, Curulla's testimony about the crime scene and the placement of the shell casings established that Harris had lied to him when she reported that the vehicle containing the shooters had traveled toward Lazier's car from the opposite direction on 24th Street. And the evidence that Harris had known that Green was one of the shooters but nonetheless asked White to provide an alibi for him established that Harris had acted "corruptly" because she knew that White's alibi testimony would have been false. *See United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990) (noting that "corruptly" in the context of the obstruction statute generally means that "the defendant knowingly and intentionally undertook an action from which an obstruction of justice was a reasonably foreseeable result"). The evidence concerning Lazier's murder was, therefore, highly probative of the charges against Harris. Even though this evidence undoubtedly was prejudicial to Harris, some degree of prejudice is characteristic of all relevant evidence. *See United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) ("[I]n a criminal trial relevant evidence is inherently prejudicial . . . ."). In this case, the prejudicial effect of the evidence in question was not so significant that it

14

substantially outweighed the probative value.  Thus, the district court did not abuse its discretion by declining to exclude all evidence concerning Lazier's murder.

Nor did the district court abuse its discretion by admitting the five crime scene photographs depicting the aftermath of Lazier's murder.  Harris argues that the district court deprived her of a fair trial by allowing the jury to see these "gruesome" and "inflammatory" photographs.  Appellant's Br. at 12-13.  In some circumstances, the admission of crime scene photographs depicting an uncharged murder may violate Rule 403.  But here, the government introduced the photographs in conjunction with Curulla's testimony about where Lazier's car had come to rest, the location of the bullet holes in the car, and the location of the bullet casings on the road.  Each of these facts was probative of whether Harris had lied to law enforcement when she reported how the murder had happened.  What is more, the photographs are not particularly sensational.  Only one of the photographs shows Lazier's body inside the car, and even that photograph is not so graphic that its admission posed an impermissibly high risk of inflaming the jury. In short, the district court did not abuse its discretion by permitting the government to admit the crime scene photographs.

## B.    The District Court Did Not Abuse Its Discretion by Admitting White's Testimony.

Harris next challenges certain purported hearsay statements that came into evidence during White's testimony.  White testified that she overheard someone

15

tell Green that Lazier "want[ed] [Green] dead because he was . . . taking all of the drug money." Doc. 97 at 40. She also testified that Green then told Harris that "he needed her to get [Lazier's] number because [Lazier] want[ed] . . . [Green] dead and they need[ed] to handle that." *Id.* at 42. Harris now challenges the admission of these statements as inadmissible hearsay and unfairly prejudicial. We conclude that the district court did not abuse its discretion by allowing White to testify about these statements.[4]

An out of court statement is hearsay only if it is "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Here, the government offered both of the statements not to prove the truth of the matter asserted, but to show the statements' effect on Green and Harris. *See United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay."). It did not matter whether Lazier had actually said that he wanted Green dead. Instead, the government offered these statements to show that Green and Harris *thought* that Lazier wanted Green dead, which in turn motivated the plan to murder Lazier.

---

[4] The government acknowledges that Harris objected to the admission of these statements at trial on hearsay grounds, but it argues that we should review Harris's Rule 403 argument for plain error because she never objected based on Rule 403. But White's testimony about these statements fell under the umbrella of evidence concerning Lazier's murder. Because Harris's motion in limine lodged a Rule 403 challenge to the admission of *all* evidence concerning Lazier's murder, we review the admission of White's testimony for an abuse of discretion.

16

The statements thus were not hearsay, and the district court did not abuse its discretion by admitting them over Harris's hearsay objection.[5]

Harris's Rule 403 argument also fails.  The second statement—about Green needing Harris to get Lazier's number—was highly probative because it showed Harris's participation in Green's plan to murder Lazier.  This statement allowed the jury to conclude that Harris had withheld key information from law enforcement by failing to identify Green as one of the shooters and failing to disclose that she had lured Lazier to the 24th Street House at Green's request.  The first statement—about Green overhearing that Lazier wanted him dead—was less probative, but its admission still did not violate Rule 403.  This statement only showed Green's motivation to murder Lazier and was thus unrelated to Harris's involvement in the murder.  This statement still had some probative value, however, because it helped the jury understand why Green had asked Harris to help him carry out the murder.  And this statement's disconnection from Harris's involvement in the murder cuts both ways:  it reduces the statement's probative value as well as its prejudicial effect.  Because the prejudicial effect of White's testimony failed to substantially outweigh its probative value, the district court did not abuse its discretion by admitting it.

---

[5] Because we conclude that these statements were not hearsay, we need not address Harris's separate argument that they failed to fit within the co-conspirator exclusion to the hearsay rule found in Rule 801(d)(2)(E).

**C.      The District Court Did Not Abuse Its Discretion by Admitting Green's Co-Conspirator Statements.**

Harris also appeals the district court's admission of Barton's testimony about two statements by Green on the day of Lazier's murder.  First, Harris challenges Barton's testimony that Green told him that Harris "was going to bring" Lazier to the 24th Street house.  Doc. 97 at 81.  Second, Harris challenges Barton's testimony that Green woke him up later that night saying "we . . . almost missed a text," referring to the text message from Harris that she was on her way to the 24th Street house with Lazier.  *Id.*  The district court admitted these statements over Harris's hearsay objection, concluding that the statements satisfied the co-conspirator exclusion to the hearsay rule found in Rule 801(d)(2)(E).  Harris argues that the district court should have excluded these statements as inadmissible hearsay and as unfairly prejudicial under Rule 403.

Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against an opposing party and "was made by the [opposing] party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  For evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that:  "(1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy."  *United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003).

18

Harris only challenges the government's proof on the third of these elements—that Green's statements were made in furtherance of the conspiracy to murder Lazier. Harris argues that Green's statements did not further the conspiracy because they were "merely narrative declarations." Appellant's Br. at 24 (quoting *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981)).

But "[t]his court applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988). "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). Here, Green's first statement to Barton furthered the interests of the conspiracy because it explained to Barton how they would lure Lazier to the 24th Street house so that they could murder him. *See id.* ("[S]tatements explaining the conspiracy to a new member are made in furtherance of the conspiracy.") Green's second statement to Barton also furthered the interests of the conspiracy because it alerted Barton that Lazier was nearing the house and that their plan was moving into action. Because Green's statements to Barton were made in furtherance of the conspiracy to murder Lazier, they satisfied the exclusion found in Rule 801(d)(2)(E).

As for Harris's argument that the district court should have excluded Barton's testimony about Green's statements under Rule 403, we disagree. These

statements were highly probative because they showed Harris knew of and participated in the murder plan and thus her statements to law enforcement were untrue.  Although the statements were also prejudicial to Harris, that prejudice failed to substantially outweigh the statements' probative value.  As a result, the district court did not abuse its discretion by permitting Barton's testimony.

**D.**     **The District Court Did Not Abuse Its Discretion by Admitting Evidence of the Protective Order Entered in the Villanueva Case.**

Harris's final evidentiary challenge is to the district court's admission of evidence relating to the protective order entered in the Villanueva Case.  The jury heard not only what the protective order said, but also evidence that the protective order was violated when White's name was leaked to the public.  One of the government's witnesses testified that the government was forced to react to this leak by immediately relocating White to a safe location.  Harris argues that this evidence was irrelevant and unfairly prejudicial, in part because she was unaware of the protective order.

We disagree.  The evidence relating to the protective order was relevant to and probative of the charge of witness tampering.  The government charged Harris with witness tampering under 18 U.S.C. § 1512(b)(1), which sets out criminal penalties for anyone who "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

20

"[W]hether a communication is a threat is a question of fact to be left to the jury." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (internal quotation marks omitted). This question turns in part on whether "a reasonable recipient, familiar with the context of the communication, would interpret it as a threat." *Id.* (internal quotation marks omitted). Even though Harris was unaware of the protective order, its mere existence showed that witnesses in the Villanueva Case faced substantial risks and therefore reasonably could have interpreted the communications that Harris posted on Facebook as threats. The evidence that White's name was leaked in violation of the protective order and that the government was forced to relocate White was probative for the same reason: it established the risks facing witnesses in the Villanueva Case, which allowed the jury to assess whether Harris's Facebook posts were threats. The prejudicial effect of the evidence relating to the protective order was rather small compared to the probative value. The district court therefore did not abuse its discretion by admitting this evidence.

E.    **Because the District Court Committed No Error, Harris's Cumulative Error Argument Fails.**

Harris's final argument is that the cumulative effect of the district court's erroneous evidentiary rulings warrants reversal of her convictions. "Even where individual judicial errors . . . may not be sufficient to warrant reversal alone, we may consider the cumulative effects of errors to determine if the defendant has

21

been denied a fair trial." *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009). But here, as set out above, Harris has failed to show that the district court erred by admitting any of the challenged evidence. As a result, Harris's cumulative error argument fails. *See United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) ("Where there is no error or only a single error, there can be no cumulative error.").

## IV.    CONCLUSION

For the reasons discussed above, we affirm the district court's evidentiary rulings and, consequently, Harris's convictions.

**AFFIRMED.**