[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12510
_____

D.C. Docket No. 2:15-cr-00115-SPC-CM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GORGE ANTONIO VARGAS,
JAVIER MARTIN VILLAR,
DANIEL VARGAS,
ZACHARIAS ABAB AGUEDO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(October 22, 2019)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and ROBRENO,[*]
District Judge.

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

ROBRENO, District Judge:

This is a criminal appeal by four defendants, each of whom was convicted, at a joint trial, of conspiracy to possess heroin with intent to distribute and possession of heroin with intent to distribute. Because the issues raised by the defendants lack merit, except the sentencing issue raised by D. Vargas, we affirm, except for D. Vargas's sentence, which we vacate and remand for D. Vargas to be resentenced.

## I.    BACKGROUND

Gorge Vargas, Javier Villar, Daniel Vargas, and Zacharias Aguedo ran a heroin-trafficking operation out of a trap house,[1] owned by G. Vargas, in Lee County, Florida. The basic structure of the operation was that G. Vargas purchased heroin from a wholesaler in Chicago and then brought it back to the trap house in Florida for distribution. At the trap house, other individuals, including G. Vargas's brothers Villar and D. Vargas, would package the heroin in "baggies" containing approximately 0.1 grams of heroin. As was adduced at trial, the defendants moved approximately 50 to 120 baggies of heroin during a 12-hour day. And G. Vargas kept the money he retained from the heroin sales in a bank safe-deposit box, access to which he shared with his girlfriend (Kathleen Smith), Villar, and D. Vargas.

---

[1] A trap house is a residence maintained for the distribution of drugs.

Law enforcement began conducting surveillance on the trap house in 2014. In November 2014, law enforcement searched the trap house with Villar's consent and recovered a firearm, $900, and several cellphones. In 2015, the authorities began working with a confidential informant, who testified at trial. This confidential informant participated in six controlled buys from the defendants' trap house and other Lee County locations in May and June 2015. The confidential informant purchased drugs from each of the defendants.

In June 2015, law enforcement performed a trash pull at G. Vargas's home and recovered baggies with heroin residue, used drug-testing kits, plastic packaging commonly used to secure kilogram blocks of heroin, and utility and cable bills addressed to Smith. The authorities then executed search warrants at the trap house, Villar's home, G. Vargas's home, and the bank safe-deposit box.

First, while searching the trap house, law enforcement found Aguedo, who resided there, and seized the following items: (1) several baggies of heroin, (2) a loaded firearm, (3) utility bills addressed to G. Vargas, (4) mail and prescriptions in Aguedo's name, and (5) the distinctive shorts Aguedo wore during one of the controlled buys.

Second, from the search of Villar's home, the authorities seized the following items: (1) 28 baggies of heroin, (2) mail in Villar's name, (3) a firearm, (4)

3

a safe containing Villar's Illinois driver's license, (5) a marijuana grinder, and (6) false-bottomed canisters.

Third, from the search of G. Vargas's home, law enforcement seized the following items: (1) approximately 111 grams of heroin; (2) a loaded firearm and additional ammunition; (3) mail in G. Vargas's name; (4) a bottle of lactose, which is often used to dilute heroin; (5) opioid home-test kits; and (6) a safe-deposit key.

Fourth, as a result of the search of the bank safe-deposit box, law enforcement found $35,200 in cash.

Following the execution of these search warrants, the defendants were arrested. Law enforcement listened to a call between G. Vargas and his girlfriend, Smith, while he was incarcerated. Based on information overheard during the call, law enforcement searched G. Vargas's home again as well as a local storage unit. During these subsequent searches, law enforcement found a false-bottomed canister containing 401 baggies of heroin in G. Vargas's home. After seizing a car registered to Smith, the authorities found almost a kilogram of heroin in a hidden compartment of the car's glove box. At the storage unit, local authorities found a quarter-kilogram of heroin, two firearms, ammunition, a digital scale, a package of empty baggies, and a box containing additional lactose.

In September 2015, a grand jury returned an indictment charging all four defendants with conspiracy to possess a kilogram or more of heroin with the intent to

4

distribute in violation of 21 U.S.C. § 846 (count one); D. Vargas, Villar, and Aguedo with possessing heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) (counts two, four, and five, respectively); and G. Vargas with possessing 100 grams or more of heroin with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count six).

Villar moved to suppress evidence seized from his house during a search. The district court denied the motion. Villar then pleaded guilty to the substantive heroin-distribution charge but proceeded to trial on the conspiracy charge. The case was tried to a jury, which found all the defendants guilty of the conspiracy and possession with intent to distribute charges.

G. Vargas was sentenced to 400 months' imprisonment; Villar was sentenced to 200 months' imprisonment; D. Vargas was sentenced to 188 months' imprisonment; Aguedo was sentenced to 96 months' imprisonment. All four defendants have appealed their sentences, each of which was imposed within the respective Guidelines range.

On appeal, Villar challenges the district court's denial of his motion to suppress. D. Vargas challenges the district court's denial of two of his motions for a mistrial. Aguedo challenges five evidentiary rulings, one *Brady* ruling, and the denial of his motion for a judgment of acquittal.

## II.    DISCUSSION

All the issues raised on appeal lack merit, except for D. Vargas's sentencing claim. First, the search of Villar's home was supported by probable cause, but even if not, any error was harmless. Second, the district court did not abuse its discretion in denying D. Vargas's motions for a mistrial because the evidence complained of did not prejudice D. Vargas. Third, even assuming the district court did abuse its discretion in overruling Aguedo's evidentiary objections, any error was harmless, and the court did not abuse its discretion in denying Aguedo's *Brady* objection because he obtained all *Brady* material in a timely manner. Fourth, the district court did not err in denying Aguedo's judgment-of-acquittal motion because there was sufficient evidence to support his conviction. Fifth, all the sentences were not procedurally unreasonable because there was no procedural error, except for D. Vargas's sentence, which was procedurally unreasonable due to a mistake in the calculation of his criminal history category. And sixth, G. Vargas's, Villar's, and Aguedo's sentences were not substantively unreasonable in the totality of the circumstances. We discuss each of the defendants' challenges seriatim.

### A.    *The District Court Did Not Err In Denying Villar's Motion To Suppress Evidence Seized From His Residence And Any Error Was Harmless.*

Villar contends that the district court erred in denying his motion to suppress evidence seized from his home because the warrant was not supported by probable cause. But there were ample facts and circumstances to reasonably conclude that

6

evidence of illegal activity would be found in Villar's home. And even if there was not probable cause, any error was harmless because the evidence against Villar was overwhelming.

We review "a district court's denial of a defendant's motion to suppress under a mixed standard of review," where findings of fact are reviewed for clear error and the application of law to facts is reviewed de novo. *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007). Even if the district court did err in denying a motion to suppress, the error will be found harmless if "the other evidence of guilt was so overwhelming that the defendant suffered no prejudice from the admitted evidence." *United States v. Rhind*, 289 F.3d 690, 694 (11th Cir. 2002).

### 1. The Warrant was Supported by Probable Cause

To establish probable cause, an affidavit "need only contain 'sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched.'" *United States v. Shabazz*, 887 F.3d 1204, 1214 (11th Cir. 2018) (quoting *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002)). Further, "[t]he affidavit need not allege illegal activity occurred at the home, but 'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'" *United States v. Lebowitz*, 676 F.3d 1000, 1011 (11th Cir. 2012) (quoting

*Martin*, 297 F.3d at 1314).

In this case, the affidavit sets out that (1) a confidential informant advised authorities that Villar had been selling large quantities of heroin in Lee County, Florida; (2) Villar stopped at his home and then his business office before proceeding to a gas station for a first scheduled drug deal; (3) Villar stopped at his office before proceeding to a gas station for a second scheduled drug deal; and (4) a trash pull from Villar's residence revealed marijuana and a piece of tinfoil burned at one end, which is commonly used to smoke marijuana. The affiant detective also stated that, based on the trash pull and his training and experience, he believed that the residence was a place where narcotics were housed and sold.

In challenging the search, Villar argues that there was no probable cause because there was no nexus between his sale of heroin and his home. But the affidavit does not need to establish that the drugs were sold at Villar's home; rather, the affidavit need only establish a connection between Villar's home and the sale of drugs. *See United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) ("[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." (quoting *Martin*, 297 F.3d at 1314)).

Here, the affidavit established that Villar stopped at his home before selling heroin to the confidential informant. Thus, the affidavit specifically links a sale of

8

heroin to Villar's home. Further, the affidavit points to other drug-related contraband found in Villar's trash, thereby connecting Villar's home to drug activity. Additionally, the affiant detective stated that he believed, in light of the contraband recovered from the trash pull as well as his training and experience, that contraband and evidence of drug trafficking would be found at the home. *See United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015) ("Where evidence shows that the defendant 'is in possession of contraband that is of the type that [one] would normally [hide] at their residence,' there is sufficient probable cause to support a search warrant." (alterations in original) (quoting *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008))).

### 2.  Any Error was Harmless

But even if probable cause was lacking, any error in admitting the heroin and firearm recovered from the search was harmless because Villar's conspiracy conviction was supported by overwhelming evidence. *See United States v. Burgest*, 519 F.3d 1307, 1311 (11th Cir. 2008) ("[B]ecause the record demonstrates that the evidence of guilt was overwhelming, any error in admitting [the defendant's] incriminating statement was harmless.").

Specifically, evidence was adduced at trial that Villar sold heroin to the confidential informant at two controlled buys as well as on other occasions prior to the controlled buys. Additionally, two coconspirators testified that they had seen

Villar packaging and cutting up heroin with G. Vargas and D. Vargas. A coconspirator also testified that the operation originally involved packaging heroin at Villar's neighboring apartment and that Villar regularly worked at, and delivered heroin to, the trap house. Further, on a recorded prison call, G. Vargas told Smith that Villar owed him money for the heroin Villar had sold and that Villar would help her sell the rest of the heroin. The evidence of guilt is overwhelming such that any error in admitting the evidence found at Villar's home was harmless.

Villar argues that any error as to probable cause was not harmless because the gun found in Villar's home was the gun used for the sentencing enhancement. This argument fails for two reasons. First, the enhancement was based on the guns possessed by the coconspirators, including the gun found at the trap house near baggies of heroin. *See United States v. Villarreal*, 613 F.3d 1344, 1359 (11th Cir. 2010) ("A co-conspirator's possession of a firearm may be attributed to the defendant for purposes of this enhancement if his possession of the firearm was reasonably foreseeable by the defendant, occurred while he was a member of the conspiracy, and was in furtherance of the conspiracy."). Second, the enhancement was a sentencing issue and the exclusionary rule does not apply in the sentencing context. Thus, any error in failing to suppress this evidence was harmless to Villar in the application of the sentencing enhancement. *United States v. Lynch*, 934 F.2d 1226, 1237 (11th Cir. 1991) ("[W]e decline to extend the exclusionary rule to sentencing proceedings.").

*B. The District Court Did Not Abuse Its Discretion In Denying D. Vargas's Two Motions For A Mistrial.*

D. Vargas challenges the district court's denial of two motions for a mistrial, arguing that the testimony extended beyond the charges in the indictment and that the government's closing argument attributed a greater quantity of drugs to D. Vargas than was suggested by the evidence. But the testimony complained of did not go beyond the timeline charged in the indictment. And the government's argument about quantity pertained to the total quantity of heroin in the conspiracy. Thus, the district court properly denied the motions for a mistrial.

The mistrial decision "is within the sound discretion of the trial court and will not be reversed unless the record reflects that the court abused that discretion." *United States v. Saldarriaga*, 987 F.2d 1526, 1531 (11th Cir. 1993). The district court has discretion to grant or deny a mistrial because it "is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Delgado*, 321 F.3d 1338, 1346–47 (11th Cir. 2003) (quoting *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002)). A mistrial is warranted where the evidence at issue prejudicially affected the defendant's rights and altered the outcome of his trial. *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007).

### 1.  The First Motion for a Mistrial

The appeal of the first mistrial motion lacks merit because the testimony

11

challenged did not go outside the bounds of the indictment. Here, a coconspirator was asked on cross-examination by Villar's counsel whether G. Vargas was selling heroin in 2012. D. Vargas argues that the affirmative answer to that question indicated that G. Vargas was dealing heroin before the period charged in the indictment. According to D. Vargas, he could not prepare to defend against uncharged bad acts that occurred prior to the alleged conspiracy. But as the district court noted, the indictment charged a conspiracy "from a time unknown but in or about 2013 through the time of the indictment." And when the government charges criminal conduct in or about a date, "[p]roof of a date reasonably near the specified date is sufficient." *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989). And a discrepancy "between the date alleged and the date proved will not trigger reversal as long as the date proved falls within the statute of limitations and before the return of the indictment." *Id.* In other words, the year "2012," which is reasonably close in time to the date alleged in the indictment, is covered within "in or about 2013." Thus, the answer to the question did not implicate G. Vargas in dealing heroin before the time charged in the indictment.

Additionally, this question did not prejudice D. Vargas because it did not pertain to him. Villar's counsel's question did not elicit testimony that D. Vargas was part of his brother's heroin-trafficking operation in 2012. The other testimony at trial established that D. Vargas did not join the conspiracy until 2015. And there

12

was no link to D. Vargas in the testimony at issue.

### 2. The Second Motion for a Mistrial

The appeal of the second mistrial motion lacks merit because the government's argument was about the quantity sold by the conspiracy, not by D. Vargas alone. Here, the government said in its closing argument that 50 to 120 baggies were sold out of the trap house each day and that D. Vargas "was moving that heroin." D. Vargas argues that this statement implied he was selling much more heroin than the evidence at trial suggested. But the record shows that, indeed, 50 to 120 baggies were sold out of the trap house a day; it also shows that D. Vargas was often at the trap house, explained to at least one of the coconspirators how to sell heroin, resupplied the trap house at least six times, and participated in two sales to the confidential informant. Taken in context, this closing statement does not implicate D. Vargas in additional sales unsupported by the evidence. Instead, the government's argument points to the evidence that D. Vargas was involved in selling drugs out of the trap house and that the conspiracy sold 50 to 120 baggies a day.

### C. The District Court Did Not Commit Reversible Error In Overruling Aguedo's Evidentiary And Brady Objections.

First, Aguedo's arguments that the district court committed reversible error in admitting four pieces of evidence and excluding one cross-examination question all lack merit because even if these rulings were erroneous, any errors were

13

harmless. There was an overwhelming amount of evidence against Aguedo even without considering the pieces of evidence he contests. Second, Aguedo's argument that the government committed a *Brady* violation lacks merit because Aguedo obtained all the materials he needed in time to present exculpatory evidence at trial.

A district court's evidentiary rulings are typically reviewed for abuse of discretion. *United States v. Harris*, 886 F.3d 1120, 1127 (11th Cir. 2018). And even where an evidentiary ruling is an abuse of discretion, the error may still be harmless if it is not of a constitutional dimension and "does not affect the substantial rights of the parties." *United States v. Gamory*, 635 F.3d 480, 492 (11th Cir. 2011); s*ee* Fed. R. Evid. 103(a) (providing that an evidentiary error may be claimed "only if the error affects a substantial right . . . ."). This requires the government to show that the error did not substantially influence the judgment. *Gamory*, 635 F.3d at 492.

### 1. Evidentiary Objections

Excluding all the evidence Aguedo complains of still leaves the record with an overwhelming amount of evidence against Aguedo. Therefore, any error was harmless. An error regarding the admissibility of evidence is only reversible if it affected substantial rights, meaning that it had a substantial impact on the outcome of the case. *United States v. Arbolaez*, 450 F.3d 1283, 1290 (11th Cir. 2006)

14

(quoting *United States v. Rodriguez*, 524 F.2d 485, 487 (5th Cir. 1975) (per curiam)). And where "sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *Id*. (quoting *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990)).

Aguedo challenges the admission of evidence of (1) a firearm at the trap house, (2) G. Vargas's income, (3) the structure of drug-trafficking operations, and (4) distinctive shorts belonging to Aguedo. Even after excluding the evidence complained of, there remains a recording of a drug sale by Aguedo to the confidential informant; the testimony of two witnesses, the confidential informant and a coconspirator, that Aguedo sold drugs out of the trap house; baggies of heroin found at the trap house; Aguedo's mail and prescriptions found at the trap house; and Aguedo's presence at the trap house when the warrant was executed. This evidence is overwhelming.

On the other hand, the evidence complained of is minor and only tangentially related to Aguedo. And Aguedo does not challenge the strongest evidence against him—a recording of his participation in a drug transaction and live witness testimony that he sold heroin out of the trap house. And this admissible evidence is sufficient to conclude that the challenged evidence did not have a substantial influence on the verdict.

15

Aguedo also challenges the exclusion of his cross-examination question, asking a detective if the confidential informant had disclosed the reason for her prior arrest. The purpose of eliciting this testimony was to impeach the confidential informant with her prior criminal history. But the confidential informant was impeached on this very ground nonetheless when she admitted that she was serving a sentence for theft at the time she was first approached by the detective. And the jury's determination of credibility is not reviewed by this Court. *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999). Further, even without the testimony of the confidential informant, there was an overwhelming amount of evidence against Aguedo. The coconspirator testimony and recording proved the same thing that the confidential informant testified to, namely that Aguedo sold heroin during the time charged in the indictment. Thus, there was sufficient evidence against Aguedo that the testimony of the confidential informant, if erroneously admitted, did not affect Aguedo's substantial rights.

### 2. Brady *Objections*

The prosecution did not suppress any evidence, thus there was no *Brady* violation. Aguedo argues that the government withheld evidence that would have assisted at trial in showing that he was merely an addict that resided at the trap house and not a drug dealer or coconspirator. He claims this constituted a *Brady* violation. A defendant's due process rights are violated if the prosecution

16

suppresses evidence favorable to him and that evidence is material to his guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To succeed on a *Brady* claim, the defendant must show (1) the government's possession of favorable evidence, (2) inability of the defendant to obtain the evidence through reasonable diligence, (3) suppression of the evidence by the government, and (4) a reasonable probability that the evidence would change the outcome of the proceedings. *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989). Aguedo's *Brady* claim fails because the government did not suppress any evidence.

Aguedo contends that the district court erred in declining to compel the production of the actual prescription bottles bearing his name, which were found at the trap house and which he contends may have contained methadone. But photographs of the bottles were produced during discovery well in advance of trial. And "[o]ur case law is clear that 'where defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government.'" *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) (alteration adopted) (quoting *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)). Thus, because the pictures of the prescription bottles were produced during discovery, there was no *Brady* violation.

17

*D. The District Court Did Not Err In Denying Aguedo's Motion For Judgment Of Acquittal.*

There was sufficient evidence for the jury to convict Aguedo because the evidence allowed an inference that Aguedo was a part of the conspiracy. A district court's denial of a judgment-of-acquittal motion is reviewed de novo, and "our evaluation is comparable to the standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United States v. Henderson*, 893 F.3d 1338, 1348 (11th Cir. 2018) (quoting *United States v. Bergman*, 852 F.3d 1046, 1060 (11th Cir. 2017)). Under this standard, we consider the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict. *Id.*

Aguedo contends that the district court erred in denying his judgment-of-acquittal motion, which was premised on insufficiency of the evidence to support his conviction. But the evidence adduced at trial is to the contrary. The evidence consists of the following: (1) the testimony of a coconspirator that Aguedo sold heroin at the trap house; (2) a recorded drug sale between Aguedo and a confidential informant; (3) the confidential informant's testimony that she had purchased heroin from Aguedo "a few times"; (4) Aguedo's presence at the trap house when the search warrant was executed; and (5) evidence seized and observed during the search of the trap house, such as mail addressed to Aguedo, prescription bottles with Aguedo's name, and the distinctive shorts worn during one of the

18

earlier heroin purchases.

Aguedo frames his challenge to the sufficiency of the evidence by focusing on the evidence that was not adduced at trial (i.e., the lack of DNA or fingerprint evidence, the lack of recorded telephone calls mentioning Aguedo or between Aguedo and other coconspirators, and the paucity of references to Aguedo by other coconspirators). But this argument ignores much of the evidence at trial that implicated Aguedo in the conspiracy. Here, after hearing testimony that Aguedo "ran" the drug operation at night, that the confidential informant had purchased heroin from Aguedo during a controlled buy, that a coconspirator shared a "shift" at the trap house with Aguedo, and that Aguedo recruited customers, along with seeing the evidence of his shorts, mail, and prescriptions at the trap house, a reasonable jury could have convicted Aguedo.[2]

Additionally, Aguedo argues that the evidence is insufficient based upon the credibility of the confidential informant, who testified that she was high or under

---

[2] *See United States v. Brantley*, 68 F.3d 1283, 1287 (11th Cir. 1995) ("The jury may reasonably have considered it to be highly improbable that the conspirators would include [the defendant] so closely in their activities without fully apprising him of the scope of the conspiracy."); *United States v. Tunsil*, 672 F.2d 879, 882 (11th Cir. 1982) (finding sufficient evidence to convict the defendant of conspiracy to distribute heroin where he was an active participant in heroin transactions after the defendant argued that although there was a conspiracy, he was not a knowing and willing participant); *United States v. Spradlen*, 662 F.2d 724, 727 (11th Cir. 1981) (finding that when the evidence was viewed in the light most favorable to the government, a jury could have reasonably concluded that the defendants were not "innocent bystanders who happened to be in the wrong place at the wrong time" but instead were participants in the conspiracy).

the influence of heroin when she made the controlled buys from Aguedo. But we do not review such credibility determinations by the jury. *See United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014) ("Importantly, to the extent that an appellant's argument 'depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and [we] may not revisit the question.'" (alteration in original) (quoting *United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009))).

### E.  All The Sentences, Except For D. Vargas's, Were Neither Procedurally Nor Substantively Unreasonable.

The sentences imposed upon the defendants were based on convictions for their participation in a conspiracy to distribute controlled substances, involving over a kilogram of heroin. The conspiracy also involved high-powered guns and a premise maintained for the distribution of drugs.

We review de novo a district court's interpretation and application of the Sentencing Guidelines and review for clear error a district court's factual findings. *United States v. Wenxia Man*, 891 F.3d 1253, 1264 (11th Cir. 2018). But the substantive reasonableness of a sentence is reviewed for abuse of discretion. *Id.* at 1265. We first consider whether a sentence is procedurally unreasonable and then decide whether it is substantively unreasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence is procedurally unreasonable where the court commits a "significant procedural error, such as failing to calculate (or improperly

20

calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* When determining whether a sentence is substantively unreasonable, we look to the totality of the circumstances, giving deference to the district court. *Id.* And it is ordinarily expected that a sentence within the Guidelines range is reasonable. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

### 1. G. Vargas's Sentence

G. Vargas's sentence was neither procedurally nor substantively unreasonable. The district court found G. Vargas's offense level was 38, criminal history category was V, and Guidelines range was 360 months to life. This was based on G. Vargas's being the leader of the conspiracy and having prior convictions for domestic violence, drug trafficking, and driving under the influence. After hearing arguments and weighing the § 3553(a) factors, the court sentenced G. Vargas to 400 months' imprisonment and 5 years' supervised release.

G. Vargas argues that the district court improperly considered that he was a leader in the conspiracy involving over a kilogram of heroin and ran a trap house in the § 3553(a) considerations because these facts were already considered in

21

determining the Guidelines range. But what is considered in the Guidelines

calculation does not limit what the district court can consider under § 3553(a).[3]

G. Vargas also argues that the sentence was substantively unreasonable

because he was sentenced to 400 months as opposed to 360 months. But this

sentence was well within the Guidelines range, which provided for up to life

imprisonment. And G. Vargas does not advance any reason why the court should

hold that such a sentence is unreasonable. Vargas cites two cases[4] where the court

imposed below-Guidelines sentences. But those cases involved different facts and

circumstances, and the district court had discretion to weigh the facts and

circumstances in this case. G. Vargas was the leader of a large heroin distribution

conspiracy that involved guns and a trap house, and the court sentenced him based

on these facts. The district court was uniquely situated to evaluate the application

of the § 3553(a) factors, and we will not second-guess its sound exercise of

discretion. *See Gall*, 552 U.S. at 51 ("The fact that the appellate court might

reasonably have concluded that a different sentence was appropriate is insufficient

---

[3] *See United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008) ("[Although the defendant's] previous offenses were included in his criminal history and were therefore part of the calculation of his guideline range, the court emphasized that he had committed previous 'fraud-related' crimes. This fits squarely into one of the § 3553(a) factors, the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1), and was therefore a proper basis for the court's consideration." (citing 18 U.S.C. § 3661)).

[4] *United States v. Williams*, 435 F.3d 1350 (11th Cir. 2006); *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006).

to justify reversal of the district court."). The district court did not abuse its discretion.

### 2. Villar's Sentence

Villar's sentence was neither procedurally nor substantively unreasonable. Villar was charged with two counts related to heroin distribution, and he pleaded guilty to one count but not the other. The court found Villar's offense level was 35 and criminal history category was I, producing a Guidelines range of 168 to 210 months' imprisonment. This was based on Villar's role in the offense (being second-in-command of the conspiracy), being accountable for guns in connection with the drug trafficking, and not qualifying for an acceptance of responsibility adjustment. After hearing arguments and weighing the § 3553(a) factors, the court sentenced Villar to 200 months' imprisonment and 5 years' supervised release.

First, Villar argues that the court erred in applying an enhancement for possession of a firearm. A two-level enhancement should be applied to the offense calculation when a defendant possesses a dangerous weapon, unless "it is clearly improbable that the weapon was connected with the offense [such as] an unloaded hunting rifle in the closet." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) cmt. n.11 (U.S. Sentencing Comm'n 2018). Villar analogizes the gun found in his bedroom to "the unloaded hunting rifle" referenced in the Sentencing Guidelines comment. Regardless of the merits of this argument, under the circumstances of

this case, the undisputed possession of guns by others in the conspiracy, such as the gun found in the trap house next to the heroin, is charged to Villar as a coconspirator. *See United States v. Villarreal*, 613 F.3d 1344, 1359 (11th Cir. 2010) ("A co-conspirator's possession of a firearm may be attributed to the defendant for purposes of this enhancement if his possession of the firearm was reasonably foreseeable by the defendant, occurred while he was a member of the conspiracy, and was in furtherance of the conspiracy.").[5] Thus, the enhancement was applicable to Villar.

Villar also argues that the court erred in applying an enhancement for his performance of a managerial role. The district court should enhance a defendant's offense level "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). And this enhancement is justified when the defendant sells drugs to others who then resell the drugs and return the proceeds to the defendant. *United States v. Matthews*, 168 F.3d 1234, 1249–50 (11th Cir. 1993). Villar admitted that he sold drugs to others ready to resell those drugs. Additionally, the court found that he was second-in-command of the

---

[5]  *See also United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) ("To that end, we have found it reasonably foreseeable that a co-conspirator would possess a firearm where the conspiracy involved trafficking in lucrative and illegal drugs.").

24

conspiracy and gave orders to subordinates. So, this enhancement was properly applied to Villar.

Villar next argues that the court erred in not granting him a downward departure for acceptance of responsibility. We review the district court's assessment of acceptance of responsibility for clear error. *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009). And "[a] defendant who fails to accept responsibility for all of the crimes he has committed and with which he has been charged is entitled to nothing under [the acceptance of responsibility provision]." *United States v. Thomas*, 242 F.3d 1028, 1034 (11th Cir. 2001). Villar accepted responsibility for one charge but not for the second charge, forcing the government to prove his guilt at trial. Thus, there was no clear error in denying the downward departure.

Last, Villar argues that his sentence was substantively unreasonable because the district court should have granted him a downward variance. To this end he argues that Congress intended the ten-year mandatory minimum to be commensurate to the crime, that a ten-year sentence would promote respect for the law and allow him to pursue rehabilitative treatment, and that he would be deterred by a ten-year sentence because he was deterred for twenty years by a brief prior sentence. But the court did not abuse its discretion here because it considered the § 3553 factors and weighed them to determine Villar's sentence. The district court

rejected Villar's arguments, noting that the basis for its sentence was that Villar was second-in-command of this large heroin distribution conspiracy and was a member of the conspiracy for over a year. There was no abuse of discretion in the district court's denial of the request for a downward variance.

### 3. Aguedo's Sentence

Aguedo's sentence was neither procedurally nor substantively unreasonable. The court found Aguedo's offense level was 26 and his criminal history category was III. This was based on a finding that he was accountable for between 100 and 400 grams of heroin, instead of the entire 1.35 kilograms involved in the conspiracy, and that he was an average participant in relation to this conduct. After hearing arguments and weighing the § 3553(a) factors, the court sentenced Aguedo to 96 months' imprisonment and 5 years' supervised release.

First, Aguedo argues that the court should have granted him a minor role reduction because his participation and role in the conspiracy were substantially less than his codefendants' participation and roles. We consider "whether a defendant qualifies for a minor role adjustment under the Guidelines [to be] a finding of fact that will be reviewed only for clear error." *United States v. Rodriguez De Varon*, 175 F.3d 930, 934 (11th Cir. 1999) (en banc). The district court should consider (1) the defendant's role in the relevant conduct for which he is being held accountable and (2) the defendant's role as compared to that of other

26

participants in the defendant's relevant conduct. *Id.* at 940. And, "an adjustment only makes senses analytically if the defendant can establish that her role was minor as compared to the relevant conduct *attributed to her*." *Id.* at 941.

Here, Aguedo was found to be an average participant in the relevant conduct of distributing 100 to 400 grams of heroin, which was less than the relevant conduct of his codefendants, who had the full 1.43 kilograms attributed to them. So, while he might have been a minor participant with regard to the 1.43 kilograms in the conspiracy, he was not a minor participant with regard to the 100 to 400 grams of heroin for which he was found responsible as relevant conduct.

Aguedo also argues that the court should have granted him a downward departure based on mental illness and diminished capacity. But "[w]e lack jurisdiction to review a district court's decision to deny a downward departure unless the district court incorrectly believed that it lacked authority to grant the departure." *United States v. Dudley*, 463 F.3d 1221, 1228 (11th Cir. 2006). And "when nothing in the record indicates otherwise, we assume the sentencing court understood it had authority to depart downward." *Id.* (quoting *United States v. Chase*, 174 F.3d 1193, 1195 (11th Cir. 1999)).

In this case, the record reveals that neither the district court nor the parties specifically mentioned the downward departure motion raised in Aguedo's sentencing memorandum during the sentencing hearing (the hearing only discussed

27

the variance). Nevertheless, there is nothing in the record to indicate that the district court believed that it did not have the authority to grant the downward departure. Accordingly, it is assumed that the district court understood that it had such authority. Under the circumstances, we lack jurisdiction to review the denial of the downward departure motion.

Last, Aguedo argues that the court should have granted him a downward variance based on mental illness and diminished capacity. But the court weighed the § 3553(a) factors and determined that, despite evidence of some mental illness or diminished capacity, the sentence was appropriate. Weighing the seriousness of this offense and Aguedo's characteristics—including that Aguedo sold heroin in the trap house, where between 50 and 120 baggies of heroin were sold daily—along with the other § 3553(a) factors, is committed to the discretion of the district court.

### 4.  *D. Vargas's Sentence*

As the government concedes, D. Vargas's sentence was procedurally unreasonable because there was an error in the criminal history category calculation. D. Vargas was sentenced to 188 months' imprisonment and 5 years' supervised release, based in part on a criminal history category of II. The criminal history category calculation relied on a prior conviction which resulted in a sentence of three years' imprisonment. But D. Vargas was allowed to serve this prior sentence as 24-hour house arrest. Thus, this conviction did not warrant a

28

criminal history category of II because D. Vargas did not serve a period of imprisonment in relation to it. *See* U.S.S.G. §4A1.2, cmt. n.2 ("To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such a sentence."); *United States v. Buter*, 229 F.3d 1077, 1079 (11th Cir. 2000) ("The critical question is whether he actually served time on those sentences."). D. Vargas's sentence will be vacated and remanded for resentencing.

### III.    CONCLUSION

We **AFFIRM** Villar's and Aguedo's convictions and sentences. We **AFFIRM** G. Vargas's sentence and D. Vargas's conviction.  D. Vargas's sentence is **VACATED,** and the case is remanded for resentencing.