[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11172

_____

D.C. Docket No. 0:17-cr-60053-DPG-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LINDON AMEDE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 8, 2020)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Lindon Amede appeals his conviction and sentence of 121

months' imprisonment for attempted possession with intent to distribute five

kilograms of cocaine, 21 U.S.C. §§ 841(a)(1) and 846. As to his conviction, Amede contends that: (1) the district court abused its discretion in admitting three recorded phone calls between his unindicted co-conspirator and an undercover officer arranging the drug transaction; (2) there was insufficient evidence that Amede acted "knowingly" and "willfully"; (3) the district court's jury instruction constructively and impermissibly amended the indictment as to the mens rea element of the crime; and (4) the district court improperly limited Amede's ability to present a coercion or duress defense. As to his sentence, Amede argues the district court abused its discretion: (1) in denying his motion for a substitute court-appointed counsel filed prior to sentencing; and (2) in allowing Amede to discharge his retained attorney and in "forcing" Amede to represent himself at sentencing. After review and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Initial Investigation

In December 2016, the Drug Enforcement Administration ("DEA") and the Broward County, Florida Sherriff's Office initiated a reverse sting operation when a confidential source—referred to as "Troy"—advised Detective Gonzalo Gandarillas that "some subjects out of Trinidad were looking to buy cocaine here in South Florida." To investigate the lead, Gandarillas posed as an undercover drug trafficker and told Troy to give an undercover phone number to the potential

2

buyers.

## B.    Drug Deal Negotiations with Chang and Amede

On December 17, 2016, Detective Gandarillas received and recorded a call from Rasal Chang, from a Trinidadian area code.  When Gandarillas answered, Chang told him that "I'm calling on behalf of Troy."  Chang said he spoke with Troy considering the "logistics" and "figures."  Then, Chang said: "I spoke to my guy" who was "trying to come over" in the next few days.  Chang, as the buyer, stressed, "we will take everything, you understand, everything you have, take it . . . between 10 and 20 at a time." In other words, they would take all of the available cocaine in increments of 10 to 20 kilograms.

On December 21, 2016, Chang spoke on the phone with Detective Gandarillas and told him "my guy . . . will be there tomorrow" and would be staying until New Years.  Chang confirmed that they would be buying "between 10 and 20."  Gandarillas directed Chang to send his "guy" to Fort Lauderdale, Florida. Chang said his "guy" had Gandarillas's phone number and would call when he arrived.

The next day, on December 22, 2016, Chang drove Amede to the airport in Trinidad.  Later that same day, Chang called Gandarillas to tell him that "my guy" had departed that morning and would arrive later that day.  Gandarillas told Chang to have his guy call when he arrives.  Chang again confirmed the amount and price

3

of the cocaine. Chang said he was going to buy the cocaine in bulk for $26,000 per kilogram.

When Amede arrived in Fort Lauderdale later that day, he called Detective Gandarillas. Gandarillas answered and said, "Good evening guy." Amede responded, "It's L. I'm finally here, this is Troy, Troy's guy, just got settled in." When Gandarillas asked for Amede's name, Amede said he went by "Lin," "L," or "Yankee Boy." Amede's first name is Lindon. Amede asked when they could meet in person, and Gandarillas said he would have to call Amede back. Because of the impending holiday season, however, Gandarillas and Amede postponed the transaction and Amede flew back to Trinidad.

Through a series of phone calls among Detective Gandarillas, Chang, and Amede, the parties rescheduled the drug deal for January 2017. Chang called Gandarillas and provided flight information for Amede's arrival in Fort Lauderdale on January 5, 2017. Gandarillas was directed to pick Amede up from the airport.

As Amede conceded at trial, he flew to Florida knowing that he was there to verify and negotiate the cocaine deal. Upon his arrival, Amede called Gandarillas to provide his location and a description of what he was wearing so they could identify each other. Gandarillas spotted Amede and picked him up. Unbeknownst to Amede, Gandarillas and his team set up surveillance at the airport, and Gandarillas had audio and video recording devices in his car and on his person.

4

Detective Gandarillas and Amede drove to a restaurant.  On the way to the restaurant, and during the course of dinner, Amede discussed various topics, including: (1) purchasing over a dozen kilograms of cocaine, which Amede referred to as "batteries"; (2) the quality, purity, and cost of the cocaine; (3) logistics for transporting the cocaine; and (4) changing phone numbers to avoid detection by law enforcement.  Gandarillas dropped Amede off at his hotel.  Later that night, Amede called Gandarillas to tell him that it would take four to seven days to get the buyers and cash lined up.

On January 7, 2017, Amede and Detective Gandarillas met again, and Amede discussed the buyers he had in Miami, Atlanta, and North Carolina who wanted to see the product.  They continued negotiations but did not complete the transaction.  Afterwards, they spoke on the phone to set up another meeting.

On January 11, 2017, Gandarillas picked Amede up in his car and they drove to a hotel parking lot.  Gandarillas and another undercover officer, Detective Pablo Perez, planned to stage a "surprise flash," during which a seller—without notice—shows a prospective buyer a sample of cocaine for quality inspection.  Once again, the surveillance team was positioned inside and around the hotel, and Gandarillas had audio and video recording devices in his car and on his person.

When Detective Perez arrived at the scene, he got into the car with Detective Gandarillas and Amede and showed Amede a kilogram of cocaine.  Amede tasted

5

a sample on his gums and indicated that the sample was good. Amede again discussed his prospective buyers and completing the deal. Detective Perez got out of the car, and Gandarillas dropped Amede off at his hotel.

Subsequently, Detective Gandarillas and Amede spoke several times on the phone about Amede's buyers, whether Amede had the purchase money, the amount and quality of the drugs, and how the transaction had been delayed several times. Gandarillas also spoke on the phone with Chang, who discussed purchase money and asked if Amede could pay for the cocaine with watches worth $75,000 each. When Gandarillas insisted on cash, Amede pawned the watches for $125,000. Amede testified that those were his own watches, that he used his own money to pay for the cocaine, and that Chang did not provide him any money for the deal. Eventually, Amede and Chang agreed to purchase five kilograms of cocaine from Gandarillas for $125,000. Amede was to meet Gandarillas on January 25, 2017 at a gas station to complete the deal.

## C.    January 25, 2017 Cocaine Transaction

On January 25, 2017, Amede met Detective Gandarillas and confidential source Troy at a gas station, which was under video and audio surveillance by law enforcement. Amede arrived driving a van that Chang's associates had provided to him. Amede said that he was using this van, which was outfitted to operate as a handicapped van, because, if he got pulled over, he could tell the police that he was

6

a disabled veteran.

When Detective Gandarillas entered the van, Amede showed him a secret compartment containing black plastic bags of cash for the drugs. Gandarillas, satisfied with the purchase money, had Amede follow him and Troy to a warehouse to retrieve the cocaine. Again, the warehouse was under video and audio surveillance by law enforcement, and Gandarillas wore an audio recording device.

The parties arrived at the warehouse, where undercover Detective Perez was waiting. Amede inspected the five kilograms of cocaine and rubbed some on his gums. While Gandarillas and Perez counted the cash, Amede felt relieved, drank a beer, made casual conversation, laughed, made jokes, and talked about future drug deals. Amede brought just under $125,000 in cash for the five kilograms of cocaine.

The parties realized that Amede was short some cash, and Amede said he would sell the five kilograms and use the proceeds to pay the difference. Amede also said he wanted to buy an additional 20 kilograms of cocaine the following day. Amede gave Gandarillas and Perez his watch as both collateral for the balance and a deposit on the additional 20 kilograms of cocaine he would be picking up the next day. Minutes later, a SWAT team entered the warehouse and arrested Amede.

**D.    Amede's Post-Arrest Statements**

Following Amede's arrest, lead case Agent Brett Palat read Amede his Miranda[1] rights, and Amede agreed to provide a statement.[2]  Amede admitted that he sought to purchase cocaine when he went to South Florida and that he and Chang were going to make about $20,000 on the drug deal.

During the interview, Amede voluntarily participated in two recorded controlled calls, one to Chang and the other to a co-conspirator who had traveled from Jamaica to purchase the cocaine.  Amede also gave written consent for the officers to search his various cell phones.  The searches revealed that, from December 16, 2016 until January 23, 2017, Amede and Chang regularly messaged each other to discuss deal logistics, to give updates on their whereabouts, and to go over how the meetings went.  Throughout their conversations, they spoke amicably to each other, asked how each other was doing, wished each other luck and safety, and gave words of encouragement for their deals to succeed.

**E.    Amede's Duress Defense**

At trial, Amede's defense was that he was under duress and/or was coerced to participate in the drug deal.  Amede testified that he was indebted to Chang and that Chang and his associates—who were part of a terrorist group in Trinidad—

---

[1]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[2]Amede's three-hour post-arrest statements were not in writing or recorded.

forced Amede to be involved in this drug deal. Chang and two associates took Amede and his wife to the airport, sent Amede to South Florida but kept his wife, and made Amede pay for the drugs himself, like a ransom payment. Amede claimed he was not a drug trafficker and had never used cocaine. Instead, Chang and his associates set Amede up with the hotel and the van with the hidden compartment, gave him instructions, and taught him how to sample cocaine. Amede made up the drug buyers he claimed to have.

Amede testified that the terrorist group had threatened him and his family, and his family was in danger in Trinidad. He also spoke of a dangerous man referred to as "RoboCop"—whom he claimed he mentioned in his post-arrest statements. According to Amede, Trinidadian law enforcement was corrupt and had twice mistreated him: (1) in February 2016, the terrorist group set Amede's boat on fire, but when he told the Trinidadian police, they arrested him instead; and (2) in November 2016, Trinidadian Coast Guards had kidnapped and beat Amede, but when he filed a police report, no action was taken. Amede claimed that the Trinidadian police later extorted him.

Amede later contradicted himself on several of these points. He testified that Chang was his "friend" and they were "cordial," Chang was merely a mediator and his associates were more dangerous. Chang and his associates did not hold Amede's wife captive while he consummated the drug deal in South Florida.

9

Moreover, Agent Palat testified that, during Amede's three-hour post-arrest conversation, Amede never claimed that anyone had threatened him or his family or forced him to purchase the cocaine in the instant drug deal. Agent Palat conceded that Amede did reveal information about the Trinidadian terrorist group, that one of its members, "Derrick," had killed "RoboCop" and that "Derrick's" wife was later beheaded.

Amede admitted that, at no point between December 2016 and his arrest did he ever attempt to contact U.S. law enforcement about any threats made by Chang and his associates. Amede insisted that U.S. law enforcement would not have been able to help his family in Trinidad. Amede did contact the Trinidadian police; however, Amede did not specify whether he did so in relation (1) to the instant forced drug deal between December 2016 and his arrest, or rather (2) to the prior incidents in Trinidad in February or November 2016.

## II. TRIAL

### A. Indictment, Plea, and Pre-trial Motions

In 2017, Amede was indicted for "knowingly and willfully attempt[ing] to possess with intent to distribute" five kilograms or more of cocaine based on the January 25 drug deal. Amede was appointed counsel and pled not guilty.

Before trial, Amede filed a counseled motion to suppress his post-arrest

10

statements and physical evidence obtained from the search of his cell phones.[3]

After a hearing, the district court denied the motion. Amede also filed a counseled

motion in limine to exclude any recordings, transcripts, or testimony of

conversations between Chang and Detective Gandarillas between December 17

and 22, 2016—prior to Amede's introduction to Gandarillas—because the

government had not established that a conspiracy existed between Chang and

Amede at the time of those conversations. Amede argued the conversations were

hearsay and not admissible under Federal Rule of Evidence 801(d)(2)(E) as

statements of a co-conspirator during the course and in furtherance of the

conspiracy.

At a pre-trial hearing, the government proffered that its evidence would

show that a conspiracy existed between Amede and Chang between December 17

and 22. Namely, during their conversations between December 17 and 22, Chang

talked to Gandarillas about the quantity of cocaine he wished to purchase and made

numerous references to "my guy" who would be coming to meet with Gandarillas.

"[M]y guy" ended up being Amede, who flew to Fort Lauderdale and called

Gandarillas to meet up. Plus, Amede admitted that Chang was his co-conspirator,

---

[3]Throughout the proceedings, Amede had difficulties with counsel, filed numerous pro se motions, and requested new counsel. Because Amede does not challenge the denial of any of his pro se motions, we need not address their merits here. Amede does challenge the district court's rulings as to the appointment of a substitute counsel for his sentencing hearing. The relevant motions, proceedings, and rulings will be discussed in detail later in this opinion. See infra Section VIII.

he had numerous phone calls and messages with Chang, and he cooperated against Chang. The district court found the government's proffer sufficient and denied Amede's motion in limine.

## B.    Government's Case in Chief

During its case in chief, the government presented: (1) the testimonies of Detectives Gandarillas and Perez and another law enforcement officer; (2) the messages between Amede and Chang; (3) the recorded phone calls; (4) the audio and video recordings of the meetings; and (5) photographs of Amede's purchase money, his watch, the van, and the cocaine. At the close of the government's case, Amede moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied.

## C.    Defense

Next, Amede proffered his duress defense. Outside of the jury's presence, Amede's court-appointed counsel claimed that Chang and his associates had threatened to hurt Amede and his family in Trinidad if Amede did not complete the drug deal to repay a debt he owed to Chang. The district court agreed with the government that Amede's proffer failed to meet the third element of a duress defense. Despite having over 30 days between first entering the country and consummating the drug deal, Amede never sought a legal alternative to participating in the deal, like contacting the U.S. or Trinidadian authorities.

12

Consequently, the district court precluded Amede's duress testimony. Amede's counsel moved for a mistrial, which the district court denied. But when Amede took the stand to testify before the jury, he testified to the proffered duress evidence, largely without objection.

The defense also called Agent Palat. The defense sought to elicit Agent Palat's testimony regarding: (1) why law enforcement failed to record Amede's post-arrest statements; (2) whether, in his statements, Amede revealed the events in Trinidad and Chang and his associates' coercion that led to Amede's involvement in the drug deal; (3) whether Agent Palat followed up on Amede's allegations; and (4) the contents of the controlled calls Amede made to Chang in Agent Palat's presence. The district court ruled that Amede was not to elicit any such testimony because it had already ruled that Amede's post-arrest statements were admissible, the fact that the statements were not recorded was otherwise irrelevant, and arguing otherwise would create a false impression. When Agent Palat was called at trial, the defense was able to elicit his testimony about Amede's post-arrest cooperation in general.

After the defense rested, Amede renewed his Rule 29 motion, this time on the grounds that the government failed to prove Amede "willfully" and "voluntarily" participated in the drug deal. The district court denied the motion.

In rebuttal, the government recalled Agent Palat and Detective Gandarillas.

13

During Agent Palat's rebuttal testimony, the defense was able to elicit his testimony that Amede's post-arrest statements were not written down or video or audio recorded. Amede again renewed his Rule 29 motion, which was denied. Amede also renewed his request for the duress jury instruction, which the district court granted because the proffered duress testimony had come in anyway without objection and it should be up to the jury.

## D.    Jury Instructions and Verdict

The government's proposed jury instruction for the attempted possession charge required a mens rea of "knowingly,"[4] for which it provided a definition. "Willfully" was not included as a mens rea element, but the proposed instructions did provide a definition for it, albeit in brackets.

At the start of the trial, the district court asked whether Amede had any objections or additions to the government's proposed jury instructions, and Amede had no relevant objections. The district court explicitly asked the parties why there was a "willfully" instruction in brackets when it was not an element of the crime. Both sides agreed that the "willfully" instruction should be removed. The district court gave preliminary instructions to the jury, including the "knowingly" but not

---

[4]The instruction provided that the government would have to prove beyond a reasonable doubt that: (1) Amede "knowingly intended to commit the crime of possession with intent to distribute a controlled substance"; and (2) his "intent was strongly corroborated by his taking a substantial step toward committing the crime."

14

the "willfully" element, in the instruction for the attempted possession charge. Amede did not object.

At the charge conference, the parties again discussed whether the "willfully" instruction should be included. While Amede's counsel initially argued that the jury instructions should mirror the indictment, his counsel did not object to the court's mens rea instruction, which the district court actually gave and which did not include "willfully."

Specifically, the district court instructed the jury that Amede could be found guilty if it was proven beyond a reasonable doubt that: (1) Amede "knowingly intended" to commit the crime of possession with intent to distribute cocaine; and (2) his intent was strongly corroborated by his taking a substantial step toward committing the crime. The substantive crime of possession with intent to distribute required that: (1) Amede "knowingly" possessed the cocaine; (2) he intended to distribute it; and (3) the weight of possessed cocaine was more than five kilograms. The district court instructed the jury that "knowingly" meant that "an act was done voluntarily and intentionally and not because of a mistake or by accident." The district court also instructed the jury on the elements of the duress defense.

The jury found Amede guilty.

### E.    Motion for New Trial

After trial, Amede filed a counseled motion for a new trial. His motion

15

argued that the district court erred: (1) in admitting the three recorded phone calls between Chang and Detective Gandarillas that occurred before Amede entered the conspiracy; and (2) in preventing Amede from presenting a competent duress defense because it denied him sufficient cross-examination of Agent Palat and disallowed Amede's full testimony about the facts supporting his duress defense. After holding two hearings, the district court denied the motion.

### III. SENTENCING

Amede's Presentence Investigation Report ("PSI") assigned him a base offense level of 30 plus 2 levels for obstruction of justice based on Amede's alleged perjury at trial. Amede's total offense level of 32 and criminal history category of I yielded an advisory guidelines range of 121 to 151 months' imprisonment. While court-appointed trial counsel filed no written PSI objections, Amede filed pro se written objections to the PSI.

At sentencing, Amede initially was represented by newly retained counsel but ultimately proceeded pro se. The district court found that Amede's advisory guidelines range was 121 to 151 months and that Amede was subject to a statutory mandatory-minimum sentence of 120 months' imprisonment. Amede's retained counsel made no objections at the hearing.

The district court addressed Amede's pro se written objections to the PSI and overruled each as meritless. The district court explained that—after

16

considering the parties' arguments, the PSI, the advisory guidelines range, and the § 3553(a) factors (especially Amede's military service)—a sentence at the low-end of the advisory guidelines range was appropriate.  The district court sentenced Amede to 121 months' imprisonment, followed by 5 years' supervised release. Amede timely filed this appeal.

## IV.  MOTION TO EXCLUDE CO-CONSPIRATOR STATEMENTS

On appeal, Amede argues that the district court abused its discretion under Fed. R. Evid. 801(d)(2)(E) by denying his motion to exclude the three recorded phone calls between co-conspirator Chang and Detective Gandarillas to arrange the drug deal.[5]

Pursuant to Rule 801(d)(2)(E), a co-conspirator's statements made "during and in furtherance of the conspiracy" are not hearsay.  Fed. R. Evid. 801(d)(2)(E); United States v. Harris, 886 F.3d 1120, 1130 (11th Cir. 2018).  For such statements to be admissible, the government must prove by a preponderance of the evidence (1) that there was a conspiracy (2) that included the declarant and the defendant, and (3) the subject statements were made during the course and in furtherance of the conspiracy.  Id.  In making this determination, the district court may consider

---

[5]This Court reviews the district court's evidentiary rulings for an abuse of discretion. United States v. Harris, 886 F.3d 1120, 1130 (11th Cir. 2018).  Findings of fact will be overturned only if they are clearly erroneous.  United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009).

17

the co-conspirator's statements as well as independent external evidence. United

States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003). The government may

provisionally admit co-conspirator statements so long as it subsequently connects

the statements to the conspiracy with sufficient evidence. Id.

Amede contends that there was no evidence that he was a member of the

conspiracy at the time of the three recorded phone calls because he was never

named during those calls and was not yet known to law enforcement. This

argument fails because "a co-conspirator's declaration made in the course and in

furtherance of a conspiracy is admissible against a co-conspirator, even one who

may have joined the conspiracy after the statement was made." United States v.

Reeves, 742 F.3d 487, 503 (11th Cir. 2014). And Amede does not deny that the

statements Chang made to Detective Gandarillas during these phone calls were

made during the course and in furtherance of the drug conspiracy. So, even if

Amede did not join the drug conspiracy until after these phone calls were made,

Chang's statements therein were still admissible against Amede. See id.

Regardless, contrary to Amede's factual contention, the government

established by a preponderance of the evidence that Amede and Chang were

involved in a conspiracy at the time of the three recorded phone calls—December

17, 21, and 22, 2016. See Hasner, 340 F.3d at 1274. On December 17, Chang told

Gandarillas that Chang worked out logistics and figures with confidential source

18

Troy and that "my guy" would "come over" to meet with Gandarillas soon. On December 21, Chang told Gandarillas that "my guy" would fly to Fort Lauderdale to meet Gandarillas and would call him upon arrival. On December 22, after Chang drove Amede to the airport, Chang called Gandarillas to tell him that "my guy" got on the flight and would arrive later that day.

From as early as December 16, Amede and Chang regularly messaged each other about the logistics of this cocaine deal. And, as Amede admitted at trial, he did indeed fly to Fort Lauderdale on December 22 to verify and negotiate the cocaine deal with Detective Gandarillas. Upon his arrival, Amede called Gandarillas, revealed that he was one of "Troy's guy[s]" who had just arrived and settled in, and asked to meet up. From that point on, Amede remained in constant contact with both Chang and Gandarillas to negotiate and eventually consummate the five-kilogram cocaine deal on January 25, 2017.

Therefore, the evidence established that it was more likely than not that—as early as December 17, 2016—Amede was Chang's "guy" who would be flying, and did in fact fly, to meet Gandarillas to negotiate and consummate the cocaine deal. The district court did not clearly err in finding this occurred and did not abuse its discretion in admitting the three recorded phone calls as co-conspirator statements made during and in furtherance of the drug conspiracy.

19

## V. JURY INSTRUCTION – CONSTRUCTIVE AMENDMENT

Next, Amede contends that the district court violated his Fifth Amendment rights when it instructed the jury that, to convict Amede, it had to find that he "knowingly"—rather than "knowingly and willfully," as charged in the indictment—attempted to possess with intent to distribute cocaine. Amede maintains that the district court's omission of "willfully" was an impermissible constructive amendment of the indictment constituting per se reversible error.[6]

Under the Fifth Amendment, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." United States v. Madden, 733 F.3d 1314, 1317-18 (11th Cir. 2013). "[A] defendant can be convicted only of a crime charged in the indictment" and "[t]he district court may not constructively amend the indictment." Id. at 1318. The district court "constructively amend[s]" the indictment when it alters the essential elements of the charged offense in the indictment to broaden the possible bases for a conviction beyond those contained in the indictment. Id. However, "[i]t is not an unconstitutional amendment to 'drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it . . . .'" United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995) (quoting United States v. Miller,

---

[6]Generally, this Court reviews de novo the propriety of the trial court's jury instruction. United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013).

20

471 U.S. 130, 144, 105 S. Ct. 1811, 1819 (1985)).  "[M]ere surplusage may be deleted from an indictment without error."  Id.

Contrary to Amede's contention, the government was not required to prove that his attempted possession with intent to distribute cocaine was "willful" under §§ 841(a)(1) and 846.  Under § 841(a)(1), it is unlawful for any person to "knowingly or intentionally" possess with intent to distribute a controlled substance.  21 U.S.C. § 841(a)(1).  Under § 846, a person who attempts to commit such an offense is subject to the same penalties as those prescribed for the substantive offense.  21 U.S.C. § 846.  "A conviction for attempt require[s] proof only that [the defendant] possessed the mens rea required for the underlying crime and took a substantial step toward the commission of that crime."  United States v. Evans, 358 F.3d 1311, 1312 (11th Cir. 2004).

This Court has held that "[t]he mens rea required for a conviction under section 841(a)(1) is knowledge, not willfulness."  United States v. Joseph, 709 F.3d 1082, 1102 (11th Cir. 2013); United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989) (providing that the elements of § 841(a)(1) are: "(1) knowledge; (2) possession; and (3) intent to distribute"); United States v. Cruz-Valdez, 773 F.2d 1541, 1544 (11th Cir. 1985) (en banc) (explaining that, as for the substantive count, the government must prove beyond a reasonable doubt that a defendant "knowingly possessed" the drugs and that "he intended to distribute" them).  In

21

other words, the government need not prove that a defendant had a "bad purpose either to disobey or disregard the law." United States v. Tobin, 676 F.3d 1264, 1280-81 (11th Cir. 2012) (quotation marks omitted), abrogated on other grounds by United States v. Davila, 569 U.S. 597, 610, 133 S. Ct. 2139, 2149 (2013). In fact, "[t]he language of the statute does not refer, in any way, to willfulness, and as a consequence, we have said that the government only needs to prove that the defendant acted knowingly." Id. at 1280 (explaining that a statute's use of the word "knowingly" weighs against any possibility that Congress sought any additional scienter requirement).

Amede relies, in part, on decisions involving older pattern jury instructions. A brief history on the pattern jury instructions for this § 841(a)(1) offense, however, demonstrates that "knowingly"—rather than "willfully"—is the requisite mens rea. Before 2010, the Eleventh Circuit Pattern Jury Instructions for cocaine possession under § 841(a)(1) included both "willfully" and "knowingly" as a requisite mens rea. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Instruction 98, 561-62 (2010 revision).[7] Then, in 2010, the Pattern Jury Instructions for several offenses—including § 841(a)(1)—were amended to eliminate "willfully" from the requisite mens rea "where that term is not employed

---

[7]Available at:
http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstruction.pdf.

22

in the statute." Id. at v. The instructions for § 841(a)(1) were changed to omit "willfully" from the mens rea and to require only that the defendant "knowingly possessed" the substance and "intended to" (planned to) distribute it. Id. at 561. The Committee explained that it "omitted the word 'willfully' which was previously used in this instruction," because "'[w]illfully' is not used in the statute, and the essence of the offense is a knowing possession of a controlled substance with an intent to distribute it." Id. at 562.

When Amede was tried and convicted in 2017, it was clear that "willfully" was not an element of his §§ 841(a)(1) and 846 crime. Amede's indictment did charge him with "knowingly and willfully attempt[ing] to possess with intent to distribute" cocaine. After concluding that "willfully" was not an element of the offense, the district court correctly instructed the jury that the applicable mens rea was "knowingly" and omitted "willfully". The district court instructed the jury that it could find that Amede had the requisite intent if he "knowingly"—meaning "voluntarily and intentionally and not because of a mistake or by accident"— intended to commit the crime of possession with intent to distribute cocaine, which would have required him to "knowingly" possess cocaine. Because "willfully" is not an element of attempted possession with intent to distribute cocaine under §§ 841(a)(1) and 846, the indictment's inclusion of the word "willfully" was mere surplusage that may be disregarded without error. See Cancelliere, 69 F.3d at

23

1121. Accordingly, the district court correctly omitted the word "willfully" from the jury instruction and did not constructively amend the indictment by doing so.

Nevertheless, Amede relies on a pre-2010 case—United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001).[8] As the government points out, this pre-2010 case is unpersuasive and inapplicable to this 2017 case because, back then, the pre-2010 jury instruction used "willfully." Further, in McDowell, the defendants did not challenge the elements or requisite mens rea of §§ 841(a)(1) and 846, so the McDowell Court made no holding as to any "willfully" element. See McDowell, 250 F.3d at 1364-68. McDowell's dicta on this point is far outweighed by our Court's overwhelming precedent holding that "willfully" is not an element. Thus, the district court correctly omitted the word from the jury instruction and did not constructively amend the indictment by doing so.

Even if "willfully" is not an element, Amede argues that the district court was still required to instruct the jury on willfulness because the indictment's inclusion of the word "willfully" did not constitute mere surplusage. Amede relies on Cancelliere as a decision in which this Court determined that the district court

---

[8]While Amede cites two other pre-2010 cases—United States v. Collins, 779 F.2d 1520, 1530 (11th Cir. 1986), and United States v. Forbrich, 758 F.2d 555, 557 (11th Cir. 1985)—neither are §§ 841(a)(1), 846 cases and neither mentions any "willfully" element. Ostensibly, Amede cites Collins and Forbrich because McDowell cited these two cases to support its recitation of the elements of §§ 841(a)(1), 846. See McDowell, 250 F.3d at 1365. Upon a closer look, however, McDowell cites those two cases solely for their guidance on the elements of an attempt offense. See Collins, 779 F.2d at 1530; Forbrich, 758 F.2d at 557.

24

improperly altered the indictment when it redacted "willfully" from the jury instructions, even though the offense (money laundering) did not include "willfully" as a mens rea element.  See 69 F.3d at 1121-22.  In Cancelliere, however, this Court reiterated the general rule that "mere surplusage may be deleted from an indictment without error."  Id. at 1121.  Only the unique circumstances of defendant Cancelliere's trial made the inclusion of "willfully" in the indictment constitute more than mere "surplusage."  Id. at 1121-22.  In Cancelliere's trial: (1) the jury was preliminarily instructed that, to convict, Cancelliere had to have acted "willfully"; (2) Cancelliere's good-faith defense focused on proving that he had not acted "willfully"; (3) the government waited until after Cancelliere put on his defense to move to redact willfulness from the jury instructions, which the district court granted; and (4) then, after the evidence closed, the jury was instructed that it could convict Cancelliere without finding that he acted "willfully."  Id.

Nothing like that happened here.  Contrastingly, here: (1) the government moved pre-trial to delete the willfulness requirement from the jury instructions, which the district court granted; (2) in the preliminary instructions, the jury was instructed that, to find Amede guilty, it had to find that he "knowingly possessed the controlled substance"; (3) the jury was never instructed that "willfully" was a requisite mens rea element; (4) knowing that the jury would not be instructed on

25

any willfulness requirement, Amede nevertheless rested his defense on duress and his alleged lack of willfulness; and (5) after the evidence closed, the jury received the same instruction as it had before trial—that to convict Amede, it had to find that Amede acted "knowingly," not "knowingly and willfully." In contrast to Cancelliere's trial, Amede's trial circumstances did not render the inclusion of "willfully" in the indictment more than "mere surplusage."

## VI.  SUFFICIENCY OF THE EVIDENCE

Amede also contends the evidence was insufficient to establish that his attempted possession with intent to distribute the cocaine was "willful."[9]  Amede concedes that there was evidence that he <u>knowingly</u> participated in the phone calls with Detective Gandarillas and <u>knowingly</u> arrived at the warehouse in a vehicle with a secret compartment containing $124,900 to purchase the cocaine. Notwithstanding, Amede asserts that there was undisputed evidence that his participation in the drug deal was not <u>willful</u> or voluntary, as he testified that he was involved solely because Chang and his associates threatened Amede and his

---

[9]This Court reviews <u>de novo</u> whether sufficient evidence supports a conviction. <u>United States v. Ochoa</u>, 941 F.3d 1074, 1102 n.18 (11th Cir. 2019).  In doing so, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the government.  <u>Id.</u> "[T]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, as long as a reasonable factfinder choosing from among reasonable constructions of the evidence could find that the evidence establishes guilt beyond a reasonable doubt."  <u>Id.</u> (quotation marks omitted).  We will not disturb the jury's verdict "unless no trier of fact could have found guilt beyond a reasonable doubt." <u>United States v. Tinoco</u>, 304 F.3d 1088, 1122 (11th Cir. 2002) (quotation marks omitted).

26

family.

Because "willfully" is not an element of attempted possession with intent to distribute cocaine under §§ 841(a)(1) and 846, Amede's contention that he did not act "willfully" is irrelevant. Rather, the government was required to prove only that Amede acted "knowingly" and with intent to distribute, for which the record is rife with supporting evidence. See Poole, 878 F.2d at 1391-92 (providing that defendant's knowledge can be proven by either direct or circumstantial evidence and by evidence of surrounding circumstances).

The recorded phone calls revealed Amede calling Gandarillas to negotiate a cocaine deal and to make plans to fly to Fort Lauderdale. Phone messages between Amede and Chang showed Amede making those travel plans for the purpose of consummating the cocaine deal. Amede explicitly testified that he flew to Fort Lauderdale knowing that he was there to negotiate a cocaine deal. Audio and video recordings captured Amede speaking and meeting with Gandarillas, and at times Perez, to continue negotiations to buy large quantities of cocaine, confirm his prospective buyers, and sample the cocaine. And audio and video recordings revealed Amede arriving at a warehouse in a van with a secret compartment containing just under $125,000 to purchase five kilograms of cocaine, while discussing plans to come back the next day to purchase 20 more kilograms. All the while, Amede referred to numerous people he knew in the drug business, used

27

drug-dealing lingo (like referring to kilograms of cocaine as "batteries"), sampled the cocaine, and seemed at ease while engaging in casual conversation, laughing, making jokes, and drinking beer.  There was more than sufficient evidence that Amede knowingly was attempting to possess cocaine with the intent to distribute it.

## VII.  DURESS DEFENSE

Amede also contends that he was prevented from presenting a complete duress defense at trial, in violation of his Sixth Amendment right.[10]  In that regard, Amede argues that the district court erroneously limited: (1) his cross-examination of lead Agent Palat regarding the contents of, and the failure to record, Amede's post-arrest statements, wherein he discussed Chang and events in Trinidad that would have corroborated his duress defense; and (2) Amede's own testimony regarding these same matters.

The district court did not abuse its discretion in limiting Amede's testimony and his cross-examination of Agent Palat.  To have his duress defense submitted to the jury, Amede was required to "first produce or proffer evidence sufficient to prove the essential elements of the defense."  United States v. Montgomery, 772

---

[10]Under the abuse-of-discretion standard, we will reverse the district court's evidentiary rulings only if the resulting error affected a defendant's substantial rights.  See United States v. Frazier, 387 F.3d 1244, 1267 n.20 (11th Cir. 2004) (explaining that we will not reverse if any error was harmless).

28

F.2d 733, 736 (11th Cir. 1985); see United States v. Dicks, 338 F.3d 1256, 1257 (11th Cir. 2003) (providing that "the defendant bears the burden of proving" an "affirmative defense to [a] criminal statute[]").  The duress defense is established only when the defendant: (1) "acted under an immediate threat of death or serious bodily injury"; (2) "had a well-grounded fear that the threat would be carried out"; and (3) "had no reasonable opportunity to escape or inform [the] police."  United States v. Wattleton, 296 F.3d 1184, 1196 n.20 (11th Cir. 2002) (alteration in original) (quotation marks omitted); see also United States v. Lee, 694 F.2d 649, 654 (11th Cir. 1983) (concluding the defendant's failure to take advantage of the numerous reasonable opportunities he had to inform the police of the alleged duress he was under precluded any duress defense).

Here, Amede presented no evidence to satisfy the third element of the duress defense—i.e., that he "had no reasonable opportunity to . . . inform [the] police" that Chang and his associates were threatening Amede and his family and coercing him to consummate the instant drug deal.  Amede conceded that, even when he came to the United States, he never contacted U.S. law enforcement.  While Amede testified that Trinidadian law enforcement was corrupt, Amede never testified why he had no opportunity to at least report Chang's threats.  Amede points to no existing evidence that shows he had no reasonable alternatives to engaging in a cocaine conspiracy.

29

Although Amede believed U.S. law enforcement would not have been able to protect his family in Trinidad, his subjective and general lack of faith in law enforcement, with no supporting evidence, is insufficient. See Manners v. Cannella, 891 F.3d 959, 972 (11th Cir. 2018) ("A general distrust of all police officers is not enough . . . ."); see, e.g., United States v. Nwoye, 663 F.3d 460, 464-65 (D.C. Cir. 2011) (determining that the defendant's "conclusory assertion"—that she did not contact the authorities because all police and FBI were corrupt—was not reasonable, as she provided no concrete evidence of such corruption or that there were no other avenues for escape); United States v. Jankowski, 194 F.3d 878, 883 (8th Cir. 1999) (concluding that defendant's sole evidence of having no reasonable, legal alternative—his subjective belief that going to the police would be futile—was legally insufficient to meet the objective standard); United States v. Scott, 901 F.2d 871, 874 (10th Cir. 1990) (rejecting defendant's "amorphous belief" that contacting the police was futile because it was "neither substantiated by the evidence nor defined as to its scope and coverage").

It was still Amede's burden to prove that he did not have a reasonable opportunity to escape or inform law enforcement. See Wattleton, 296 F.3d at 1196 n.20; see also United States v. Bailey, 444 U.S. 394, 410, 100 S. Ct. 624, 635 (1980) ("[I]f there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the

30

[duress] defense[] will fail." (quotation marks omitted)).  And yet, at the very least, the record shows that Amede had numerous opportunities to contact U.S. authorities during his two trips to South Florida but did not take advantage of them. Because the district court did not abuse its discretion in ruling that Amede's duress defense was legally deficient, it did not abuse its discretion in ruling that he could not present that same evidence to the jury.

As an alternative independent ruling, assuming arguendo that the district court abused its discretion as to Amede's duress defense, any error was harmless because Amede's counsel still elicited the sought testimony to support the duress defense.  On appeal, Amede concedes that "he was able to mention some of the events that supported his defense," but contends that the district court's ruling "caused his testimony to come out abbreviated, sporadic, and incomplete."  Amede claims that he was prevented from establishing these four pieces of evidence: (1) that Amede told Agent Palat about the prior incidents in Trinidad leading to his involvement in the drug deal; (2) that Agent Palat failed to record Amede's post-arrest statements wherein Amede communicated such details; (3) Amede's testimony on the contents of his post-arrest statements and the two controlled calls he made to Chang, which would have revealed, in particular, that "Derrick" had killed "RoboCop" and "Derrick's" wife was later beheaded; and (4) Amede's testimony about the incidents in Trinidad prior to the drug deal.

31

The record directly contradicts Amede's contentions. For example, the record shows that: (1) Agent Palat testified that Amede told him about the Trinidadian terrorist group and some of the prior incidents in Trinidad; (2) Agent Palat conceded that he failed to have Amede's post-arrest statements recorded or written down; (3) Amede testified that he complied post-arrest, made post-arrest statements, and made controlled calls to Chang, and Agent Palat testified that Amede told him about "Derrick" and "RoboCop"; and (4) Amede testified at length about the incidents in Trinidad, Chang and his associates' threats against Amede and his family, and how Amede was forced to be involved in the instant drug deal. All of this questioning and testimony came in without objection by the government. Amede points to no other specific evidence that he would have elicited to complete his duress defense had the district court initially ruled in favor of his duress defense. Amede has not established that the district court's initial ruling harmed his defense.

## VIII. AMEDE'S RIGHT TO COUNSEL AT SENTENCING

In the district court, Amede had two different counsel, but he ultimately rejected both of them. Amede had (1) court-appointed counsel, Ayana Harris, throughout the trial and leading up to sentencing and then had (2) retained counsel, Scott Rubinchik, leading up to and at sentencing. Amede, while counseled, filed numerous pro se motions and repeatedly indicated his dissatisfaction with both

counsel.

On appeal, Amede contends that the district court abused its discretion and violated his Sixth Amendment rights: (1) in denying the motion for a substitute court-appointed counsel filed by Harris on Amede's behalf prior to sentencing; and (2) in later, at the sentencing itself, "forcing" Amede to represent himself, after Amede discharged retained counsel Rubinchik, without the district court finding any knowing or voluntary waiver by Amede.[11]  Amede argues that these errors warrant resentencing with new counsel.  Before delving into these challenges, we review Amede's myriad conflicts with both court-appointed and retained counsel.

## A.    Amede's Conflicts with Court-Appointed Counsel

Counsel Harris was appointed to represent Amede at trial and filed the counseled motion to suppress his post-arrest statements and physical evidence. Soon thereafter, Amede submitted a pro se "supplement" to the counseled motion to suppress.  At the hearing on the counseled and pro se motions, Amede personally addressed the district court and explained that he and Harris disagreed on matters of law and fact and that he filed his pro se motion to include arguments

---

[11]Our Court reviews the district court's denial of a criminal defendant's motion for new counsel for abuse of discretion so long as the district court conducted an inquiry into the merits of the motion, as the district court did in this case.  United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).  Whether a defendant's waiver of counsel was both knowing and voluntary presents a mixed question of law and fact that we review de novo.  United States v. Garey, 540 F.3d 1253, 1268 (11th Cir. 2008) (explaining that, on appeal, it is the government's burden to prove a valid waiver).  Amede raises no other challenge to his sentence of 121 months' imprisonment.

that Harris refused to include in the counseled motion.

When the district court denied both motions, Amede requested new court-appointed counsel based on his disagreements with Harris. The district court denied Amede's request to appoint new counsel, explained that Harris was a good lawyer who properly declined to advance the meritless arguments in Amede's pro se motion, and stated that Amede was free to hire an attorney and continue the trial.

Amede responded, "[t]hen I'll just represent myself pro se," which he felt was his only choice. The district court corrected Amede, stating that his choices were either (1) to continue with Harris or (2) to represent himself, which would severely disadvantage him. Amede confirmed that he understood he would be facing an experienced prosecutor with a formal legal education, would be held to the same standards as a represented party, and would be required to follow all of the relevant rules of procedure and evidence. Amede insisted that he understood the risks. Amede emphasized that he and Harris had a difference of opinion, and that, while he did not know the law, he knew the facts of his case.

The district court warned Amede that the evidence against him was strong and that he would be severely disadvantaged if he proceeded pro se. The district court confirmed that Amede understood he would still need to be prepared for trial. The district court asked Amede whether he had any questions "about what the

34

potential pitfalls are or problems you might run into or any questions about what it means to be representing yourself and what the potential disadvantages are." Amede solely inquired about the procedure for submitting pro se motions, which the district court answered.

Then, on the first day of trial, attorney Harris informed the district court that Amede had changed his mind and decided he wanted her representation at trial. Throughout Harris's representation of Amede at trial, she effectively cross-examined the government's witnesses, called several defense witnesses, admitted exhibits, argued Amede's duress defense, filed motions, and lodged numerous objections. During the trial, Amede made no objection to Harris's representation.

After Harris filed the counseled motion for a new trial, Amede filed a pro se "Motion for a Mistrial and/or Acquittal" raising several separate issues.

At a hearing on the counsel issue, Harris informed the district court that, post-verdict, the attorney-client relationship with Amede "ha[d] broken down to the point that [she was] not able to effectively assist him" in preparing for sentencing or filing post-trial motions. Harris and Amede explained that—due to probation's misunderstanding as to whether Amede was pro se or counseled— Harris was not notified of and thus did not attend the PSI interview, and Amede refused to participate without counsel. Harris claimed that, while she rescheduled the PSI interview so she could be present, Amede refused to meet with her, go over

35

potential PSI objections, discuss other possible motions, or attend the rescheduled interview.  Amede clarified that he would proceed with the rescheduled interview with another attorney, but not with Harris.  Because Amede refused to work with Harris and had no confidence in her representation, Harris asked the district court to appoint a substitute counsel.

The district court declined to appoint a substitute counsel because Amede had failed to present a basis for appointing new counsel and his case was too far along.  Importantly, Amede and Harris had already gone through trial and were at the sentencing stage.  New court-appointed counsel would have to order and review the trial transcript, and new appointed counsel would not be as effective as Harris, who was most familiar with the case.  The district court commented that "[i]t's going to be the same thing with new counsel, it really is," but reminded Amede of his right to hire new counsel.  Upon the district court's suggestion, Amede stated that he would be willing to participate in a PSI interview with Harris present, and Harris agreed to set up the interview.

Harris indicated that Amede still wanted his pro se "Motion for a Mistrial and/or Acquittal" filed, although Harris and the district court had reviewed Amede's motion and agreed that it was without merit.  The district court told Amede that his motion did not help his case, that Harris was a "very good lawyer," and that any new counsel might be less competent than Harris.  Nonetheless, the

36

district court made an exception and considered both the counseled and pro se post-trial motions, both of which were denied.

Thereafter, Amede filed several additional pro se motions, which the district court either struck or denied. One of those motions was a "Motion for Reconsideration for Denial of Appointment of New Counsel re Status Hearing Motion Denied," wherein Amede reiterated that his relationship with Harris had broken down, he had no confidence in her representation, they disagreed on numerous matters, and Harris refused to advance his requested objections, arguments, and motions. The district court denied the motion as meritless.

## B.    Denial of Motion for a Substitute Court-Appointed Counsel before Sentencing

While the Sixth Amendment guarantees criminal defendants the right to counsel, it does not grant defendants an unqualified right to the counsel of their choice. United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018). When the district court has appointed counsel for an indigent criminal defendant, the defendant does not have the right to demand different appointed counsel unless he can show "good cause." Id. "Good cause" exists only where there is a "fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." Id. (quotation marks omitted).

Prior to the sentencing hearing, Harris and Amede informed the district court

37

that the extent of their breakdown in communications rendered Harris unable to effectively assist Amede.  When the district court conducted a thorough inquiry into the alleged breakdown, its causes were revealed as: (1) Amede had refused to meet, speak, and prepare for sentencing with Harris after she failed to attend his PSI interview; and (2) Harris would not advance Amede's pro se arguments.  Neither basis constitutes good cause for demanding different court-appointed counsel in this case.

First, Amede was not entitled to unilaterally refuse to communicate with his appointed counsel and then seek new appointed counsel.  See Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985) ("A defendant, by unreasonable silence or intentional lack of cooperation, cannot thwart the law as to appointment of counsel.").  Harris explained that her failure to attend the PSI interview was caused by probation's failure to notify her of the interview due to a misunderstanding it had.  When Harris attempted to rectify the situation by meeting with Amede and rescheduling the PSI interview so she could attend, Amede still refused to cooperate.  Amede's lack of cooperation is not a "good cause" for new counsel.  See id.

Second, both Harris and the district court agreed that Amede's pro se arguments in his "Motion for a Mistrial and/or Acquittal" and subsequently filed motions were meritless, a ruling that Amede does not challenge on appeal.

38

Attorney Harris's refusal to adopt defendant Amede's frivolous or harmful legal positions does not constitute good cause. See Joyner, 899 F.3d at 1205-06. Rather, it was Harris's duty—as counsel "sworn . . . to represent [Amede]" and advocate for "[his] best interest"—to challenge Amede's irrelevant and meritless positions and advance only those that would lead to a favorable sentence. Id. at 1206.

Third, Amede's remaining "general loss of confidence or trust in [Harris], standing alone, is not sufficient." Thomas, 767 F.2d at 742. At bottom, Amede has not shown that the district court abused its discretion in concluding that he failed to establish good cause to warrant a substitute new court-appointed counsel at sentencing. See Joyner, 899 F.3d at 1205.

In any event, Amede failed to establish prejudice. United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997) (explaining that, if an appellant cannot demonstrate that he was somehow prejudiced at sentencing by the court's erroneous ruling as to counsel, the error was harmless), modified on other grounds by United States v. Toler, 144 F.3d 1423 (11th Cir. 1998). On appeal, Amede challenges only the district court's denial of his motion for a substitute court-appointed counsel as to Harris's preparation for sentencing, not as to the motion

for a new trial.[12]  Ultimately though, Amede was not represented by Harris at sentencing, as he hired retained counsel Rubinchik to represent him at sentencing. Although Amede thereafter fired Rubinchik, the fact remains that Amede was not represented by Harris at sentencing.  Since Harris did not represent Amede at sentencing, Amede cannot establish that but for Harris's continued representation of him, he would have received a different sentence.  See id.  In short, Amede cannot show he suffered prejudice from the district court's denial of his motion for a substitute court-appointed counsel for Harris.[13]  See id.

## C.    Amede's Conflicts with Retained Counsel at Sentencing

As noted, before sentencing, but after filing his pro se PSI objections,

_____

[12]In his initial brief on appeal, Amede expressly states that he challenges the denial of his motion for a substitute counsel only in regards to Harris's representation of him at sentencing.  In his reply brief, however, Amede contends that the denial of the motion for a substitute counsel also was an abuse of discretion given Amede's meritorious argument in one of his later-filed pro se motions that the jury instructions constructively amended the indictment.  The constructive-amendment issue goes to Amede's conviction, rather than sentencing, and the only remedy Amede has requested as to this counsel issue is that we grant him "a new sentencing hearing." Without requesting any non-sentencing-related remedy in this regard, the constructive-amendment issue appears to be irrelevant.  Even so, as discussed above, the constructive-amendment issue lacks merit and lends no more credence to Amede's efforts to substitute new counsel for Harris.

[13]For the first time in his reply brief, Amede argues that he was prejudiced because Rubinchik did not effectively assist him either.  Amede argues that, if the district court had appointed him an effective substitute court-appointed counsel, sentencing would not have been delayed and that substitute court-appointed counsel could have visited Amede in a timely manner and explained to him the benefit of trying to qualify for the safety valve to receive a lower sentence.  This argument is abandoned for failure to timely raise it.  Alternatively, we note that any argument about Rubinchik lacks merit.  Amede would not allow Rubinchik to have a conversation with him when the district court told Rubinchik to discuss the safety valve with Amede at sentencing, and thus Amede cannot complain now.

Amede retained attorney Rubinchik. The district court granted Rubinchik's motion to substitute himself for Harris as Amede's counsel. The district court also granted Rubinchik's two motions to continue the sentencing hearing.

But then, at sidebar on the day of the sentencing hearing, Rubinchik informed the district court that Amede wished to discharge him due to a disagreement over what matters could be addressed at sentencing. The district court noted that Amede would qualify for the safety-valve provision of the Sentencing Guidelines but for his failure to admit guilt and disclose all of the facts surrounding his offense. Rubinchik stated that he would discuss the issue with Amede and suggested continuing sentencing a third time. The district court rejected the request for a continuance but permitted Rubinchik a moment to discuss with Amede. Back on the record, Rubinchik informed the district court that Amede was refusing to speak with him because Amede no longer wanted his representation.

The district court proceeded with sentencing and explained the guidelines calculations, the advisory guidelines range of 121 to 151 months' imprisonment, and the mandatory-minimum sentence of 120 months' imprisonment. The district court repeatedly explained to Amede that he would qualify for the safety-valve provision, to go below the mandatory minimum, if he admitted guilt and gave a full recitation of his offense conduct. The district court invited arguments on the

41

issue and noted that, if Amede qualified for the safety valve, it would take into account Amede's military service. The government responded that Amede had not accepted responsibility, had not given a complete account of his offense conduct, and deserved a high-end guidelines sentence.

Instead of making safety-valve arguments, Amede addressed the district court himself to advise that Rubinchik was unprepared to represent him, as Rubinchik saw him for the first time the day before sentencing, did not bring the PSI to review with Amede, did not file PSI objections, and did not order a trial transcript. Amede stated that he had fired Rubinchik and was "without representation." But when the district court asked if Amede was going to represent himself like he did at trial, Amede said, "No, sir." The district court emphasized that it was proceeding with sentencing and that Amede could proceed with or without counsel. Amede responded, "Without counsel, sir."

Despite the district court's continued efforts to explain the safety-valve provision, Amede did not admit guilt, recite his offense conduct, or offer any arguments in support of safety-valve relief. Then, the district court addressed Amede's pro se PSI objections and overruled each. During their discussion, Amede appeared to be confused about what objections could be raised by him, versus by counsel. The district court reminded Amede "now you are pro se, because you don't want to have counsel." Amede responded, "I have counsel,"

42

then "I need counsel," then "I have other counsel lined up." The district court reminded Amede that they were proceeding with sentencing and moving forward.

The district court asked Amede for his sentencing recommendation and re-explained his applicable guidelines range, the possibility of a safety-valve reduction, and the otherwise applicable statutory mandatory minimum. Amede refused to offer any supporting arguments and instead insisted on having new counsel:

> THE DEFENDANT: Your Honor, I recommend that I be given the opportunity to have competent counsel to represent me, sir, that could actually go through the PSI with me.
>
> THE COURT: Okay. Besides that. I'm not going to allow that. We're going to go ahead with the sentencing. You've had two counsel. You've been a very difficult client.
> It's clear to me that you're not going to be satisfied with anybody. It's clear to me you don't listen to anybody, so I don't see any need to go further with additional counsel.
> You've had the presentence investigation report, it's pretty straightforward. Frankly, I don't see anything at all wrong [in] it. I don't see any basis for any objection.
> So, I've offered you an opportunity to take advantage of the safety valve. I'm assuming from your comments you do not want to take advantage of that; is that correct?
>
> THE DEFENDANT: I would just like counsel, Your Honor, that's it.
>
> THE COURT: All right. We're going to proceed. You don't have counsel?
> You've got counsel [Rubinchik] sitting at your table.
> You've had Ms. Harris as counsel, an excellent lawyer; and we're going to proceed with this, so do you have a recommendation with regard to the sentence?

43

THE DEFENDANT:  I just want counsel, that's it.

THE COURT:  You have an opportunity to say anything you want—

THE DEFENDANT:  I want counsel.

For a final time, the district court prompted Amede for his mitigation arguments.  Amede initially stood in silence and refused to answer.  After a brief recess, Amede repeated Rubinchik's shortcomings and that he was without counsel.  The district court stated that it was proceeding with sentencing and again asked Amede if he had anything to say "about the sentence itself."  Amede said he understood and that his sentence was "up to [the district court's] discretion."

After the district court announced Amede's sentence of 121 months' imprisonment, Amede objected on the ground that he "needed counsel to be prepared for [his] sentencing hearing, and [he didn't] have counsel."  In response, the district court informed Amede of his right to appeal his sentence, with or without the assistance of counsel.

**D.    Discharge of Retained Counsel & Amede's Waiver**

A criminal defendant who retains his counsel enjoys the right to hire, and subsequently fire, his counsel of choice.  United States v. Jimenez-Antunez, 820 F.3d 1267, 1270 (11th Cir. 2016).  "[A] defendant may discharge his retained counsel without regard to whether he will later request appointed counsel."  Id. at 1271.  The district court properly permitted Amede to exercise his right to both:

44

(1) hire retained counsel Rubinchik as a substitute for appointed counsel Harris to represent Amede at sentencing; and (2) promptly fire Rubinchik once the sentencing hearing began.  See id.

But, before granting Amede's request to dismiss Rubinchik, the district court was required to determine whether Amede "either will be represented by counsel or has made a knowing and voluntary waiver of his right to counsel."  See id. at 1272.  A district court may still deny a motion to dismiss counsel, even if the defendant will remain represented by new counsel or has made a waiver of the right to counsel if the district court determines the dismissal will "interfere with the fair, orderly, and effective administration of the courts."  Id. at 1272.

Amede contends that the district court erred in: (1) allowing him to discharge Rubinchik without appointing him new counsel or determining he was voluntarily waiving his right to counsel; (2) simply accepting Amede's initial assertion that he wished to proceed "[w]ithout counsel, sir" because he later made repeated assertions that he wanted counsel and never voluntarily waived his right to counsel; and (3) making no finding that substituting counsel at sentencing would interfere with the effective administration of the proceedings.  Amede asserts that "[f]airness dictated continuing the sentencing hearing and appointing new counsel."

Defendants have equivalent rights to counsel and to self-representation.

45

United States v. Garey, 540 F.3d 1253, 1265 (11th Cir. 2008).  A defendant may validly waive his right to counsel so long as his choice was knowing, intelligent, and voluntary.  Id. at 1266.  Whether a defendant knowingly waives his right to counsel depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct" of the defendant.  Id. (quotation marks omitted).  Ideally, a district court should engage the defendant in a colloquy during which the court informs the defendant "of the nature of the charges against him, possible punishments, basic trial procedure and the hazards of representing himself."  United States v. Kimball, 291 F.3d 726, 730 (11th Cir. 2002).  But such a hearing is not required so long as the record as a whole shows that the waiver was knowing and voluntary.  Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065 (11th Cir. 1986).

A valid waiver of counsel occurs "not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers."  Garey, 540 F.3d at 1265.  A defendant waives his right to counsel voluntarily by "affirmatively invoking his right to self-representation or by his conduct in rejecting all other available options."  Id. at 1268.  "In any given case, the proper course of action will turn on factors the district court is best

46

positioned to assess." Id. at 1266.

Here, given the totality of the record, Amede made a knowing and voluntary waiver of his right to counsel at sentencing. See id. at 1266. The district court committed no error in proceeding to sentence Amede under the particular facts and circumstances of this case. First, the district court twice continued the sentencing hearing to allow retained Rubinchik time to prepare.[14] At the sentencing hearing, the district court encouraged Amede to talk with Rubinchik, but Amede refused to speak with Rubinchik. Amede twice insisted on proceeding without Rubinchik, and the district court directed that sentencing would proceed that day. The district court attempted to discern whether Amede would be proceeding with or without counsel. At first, Amede confirmed that he would proceed "[w]ithout counsel."

Second, while the district court did not conduct another formal colloquy, Amede's background, experience, and conduct, the district court's pretrial colloquy, and the district court's explanation at sentencing, all taken together, demonstrate that Amede knowingly and voluntarily waived his right to counsel at sentencing. See id. at 1265-66. Throughout this case, the district court explained at great length the charges against Amede, possible punishments, trial and sentencing procedures, and the risks of self-representation. For example, in the

---

[14]While sentencing was originally set for February 5, 2018, the district court twice continued sentencing on: (1) February 6, 2018, reset to February 27, 2018; and (2) February 26, 2018, reset to March 8, 2016. The sentencing hearing was held on March 8, 2016.

47

sentencing hearing itself, the district court: (1) explained the guidelines calculations, the advisory guidelines range, the applicable mandatory-minimum sentence, the possibility and eligibility requirements of a safety-valve reduction, and Amede's ability to make reasonableness and mitigation arguments; (2) attempted to confirm that Amede understood the procedure of the sentencing hearing and the above aspects of the sentence he faced; and (3) confirmed that Amede understood the court needed to proceed with sentencing.

Additionally, Amede repeatedly confirmed, albeit pre-trial, that he understood the many dangers and disadvantages of self-representation—that he would be facing an experienced prosecutor with a formal legal education, would be held to the same standards as a represented party, and would be required to follow all of the relevant rules of procedure and evidence. Although Amede foiled the district court's colloquy-like efforts at sentencing by refusing to provide clear answers to its questions regarding his Sixth Amendment rights, the district court's efforts were still sufficient because the court unambiguously informed Amede of the penalties he faced at sentencing and the general challenges he faced as a pro se litigant. See id. at 1267.

What's more, Amede's uncooperative conduct throughout the case and especially at sentencing evinced a knowing and voluntary waiver. Both prior to trial and at sentencing, Amede insisted on obtaining a second substitute counsel.

48

When Amede still insisted on obtaining a second substitute counsel, the district court gave Amede three choices: (1) proceed with retained counsel Rubinchik; (2) proceed with previously appointed counsel Harris; or (3) proceed pro se. Amede refused each option.

At one point, Amede very briefly asserted that he had "other counsel lined up," but he never asserted a second substitute retained counsel was present and ready to proceed with sentencing. After having already continued sentencing twice before, the district court repeatedly emphasized that they needed to proceed with sentencing and was entitled to prevent Amede from manipulating the counsel issue in an effort to interfere with and delay the effective administration of sentencing. See Jimenez-Antunez, 820 F.3d at 1270-71 (explaining that a defendant may substitute retained counsel for other retained counsel so long as the substitution "does not interfere with the fair, orderly and effective administration of the courts," by, for example, delaying court proceedings (quotation marks omitted)).

And, to the extent Amede wanted a second substitute court-appointed counsel instead of his retained counsel Rubinchik, the district court offered previously appointed counsel Harris, whom the court already determined was competent and conflict-free. See id. at 1271. Amede had no right to demand a different court-appointed attorney, as he had not shown good cause to substitute Harris in the first place. See id. Because Amede objected to his only available and

49

constitutionally required retained-counsel and appointed-counsel options—and because he did so with the understanding that his only other option was to proceed pro se, the risks of which the district court had repeatedly warned him and he said he understood—Amede, by his uncooperative conduct, knowingly and voluntarily waived his right to counsel at sentencing. See Garey, 540 F.3d at 1265-66.

In sum, when Amede fired retained counsel Rubinchik, as he was entitled to do, the district court had already determined that court-appointed counsel Harris was competent and conflict free, and Amede was not entitled to new court-appointed counsel. Amede was clearly dissatisfied with the district court's prior ruling refusing to appoint new counsel in place of Harris. Amede, however, was not entitled to circumvent that earlier ruling by firing Rubinchik at sentencing and then insisting on a new substitute counsel again. Rubinchik had obtained two continuances of Amede's sentencing, and Amede was not entitled to a third. The record as a whole demonstrates that Amede not only waived his right to counsel, but also attempted to delay and manipulate the sentencing proceedings. Simply put, the district court committed no error.

## IX.  CONCLUSION

For all of these reasons, we affirm Amede's conviction and sentence.

**AFFIRMED.**